THE STATE OF NORTH CAROLINA by Its ATTORNEY-GENERAL, ON THE RELATION OF DELMAR C. OWENS, v. C. R. CHAPLIN.

(Filed 7 April, 1948.)

1. **Quo Warranto § 2—**

The official certificate of election is *prima facie* evidence that the person designated is entitled to the office, and imposes the burden on relator of establishing the grounds of his complaint.

2. **Appeal and Error § 40d—**

The findings of fact of the trial court are binding on appeal if supported by evidence.

3. **Elections § 2f—**

Residence as a prerequisite to the right to vote in this State within the purview of N. C. Constitution, Art. VI, sec. 2, is synonymous with domicile, which denotes a permanent dwelling place to which a person, when absent, intends to return.

4. **Same—**

Domicile, once established, cannot be lost until a new one is acquired, and therefore where an elector is a resident at the time of registration he is entitled to vote in the precinct of his residence unless prior to the election he abandons his residence here and acquires a new domicile by moving to another place with intention of making it his permanent home.

5. **Same—**

Uncontroverted testimony discloses that electors whose votes were challenged on the ground of nonresidence, left their homes and moved to another state or to another county in this State for temporary purposes, but that at no time did they intend making the other state or the other county in this State a permanent home, is insufficient to support a finding that they had lost their domicile in the county for the purpose of voting.

6. **Elections § 1—**

The General Assembly is without power to prescribe qualifications for voters different from those found in the Constitution, and the meaning of

the term "residence" within the purview of N. C. Constitution, Art. VI, sec. 2, is a judicial question and cannot be made the matter of legislative construction. G. S., 163-25 (d) and (f).

**7. Elections § 11b—**

Where the evidence supports the findings that certain absentee voters were not sworn, the rejection of their ballots is proper. G. S., 163-57; G. S., 163-58.

**8. Same—**

The fact that the oaths of absentee voters were not taken by them upon the Bible but were taken with uplifted hands, does not invalidate their votes.

**9. Same—**

The interest of the Clerk of the Superior Court in his own re-election, standing alone, does not disqualify him from administering oaths to absentee voters, G. S., 163-57; G. S., 163-58, administering the oaths being ministerial and not judicial.

**10. Same—**

The fact that the Chairman of the County Board of Elections, in company with candidates in the election, delivers absentee ballots to absentee voters at their temporary residences in another state or county is insufficient, of itself, to vitiate their votes, there being no evidence remotely suggesting coercion, fraud or imposition.

**11. Same—**

Persons in all respects qualified to cast absentee ballots will not be disfranchised for the mistake or even willful misconduct of election officials in performing their duties when the mistake or misconduct does not amount to coercion, fraud or imposition and it appears that the ballots expressed only the free choices of the electors themselves. G. S., 163-54.

**12. State § 5—**

In proper instances the State has the power to permit acts to be done outside its borders when the legal consequences of such acts are to take place within its boundaries.

**13. Elections §§ 8, 11b—**

The fact that the Chairman of a County Board of Elections delivers absentee ballots in person to the voters at their temporary residences outside the boundaries of the State, and that the voters deliver the votes in the sealed containers to him in person instead of mailing them, G. S., 163-58, is not sufficient, standing alone, to vitiate the votes. G. S., 163-55; G. S., 163-56; G. S., 163-57.

**14. Quo Warranto § 2—**

Where, in an action in the nature of *quo warranto* the evidence is insufficient to invalidate a sufficient number of votes to change the result of the election, the motion by defendant for judgment as of nonsuit should be granted.

APPEAL by defendant, C. R. Chaplin, from *Parker, J.,* at September Term, 1947, of TYRRELL.

This is a civil action in the nature of a *quo warranto* to try title to the office of Clerk of the Superior Court of Tyrrell County for the four year term commencing on the first Monday in December, 1946.

The relator, Delmar C. Owens, as the Republican candidate, and the defendant, C. R. Chaplin, as the Democratic nominee, sought election to the office in controversy at the general election on 5 November, 1946. The Tyrrell County Board of Elections met at the courthouse of the county at the appointed day after the election and opened the returns of the several precincts of the county, canvassed the votes cast in the county, judicially determined that 686 votes were cast for the defendant and that 666 votes were given for the relator, and officially declared the defendant elected to the office of Clerk of the Superior Court of Tyrrell County. Within ten days thereafter, the Chairman of the Tyrrell County Board of Elections furnished to the defendant a certificate of election under his hand and seal, and on the first Monday in December, 1946, the defendant qualified as Clerk of the Superior Court of Tyrrell County, and ever since has been discharging the duties of the office and enjoying its fees and emoluments.

This action was brought by the relator, upon the leave of the Attorney-General, on 23 December, 1946, after he had exhausted administrative machinery before the Tyrrell County Board of Elections and the State Board of Elections.

As made out by the complaint, the claim of the relator to the office in controversy may be summarized as follows: According to the official canvass of the vote by the Tyrrell County Board of Elections, the defendant was elected by a majority of 20. But such was not the true and lawful result of the election. More than 20 illegal votes were cast and counted for the defendant, and but for such illegal votes, the official canvass would have shown the relator's election. The relator is entitled to have the illegal votes rejected by the court. As the exclusion of the illegal votes would show that the relator received a majority of the legal votes cast for candidates for the office and would thus change the result of the election, the relator is entitled to the entry of a judgment ousting the defendant from the office and putting the relator in possession of it.

The validity of the relator's claim was denied by the answer of the defendant.

All of the issues in the action were referred to Honorable Kemp D. Battle for trial by the written consent of the parties. The relator presented to the referee the depositions or personal testimony of fifty-three witnesses, including virtually all of the persons alleged to have cast illegal ballots for the defendant. The defendant, however, insisted that

the testimony adduced by the relator was insufficient to support his claim, and refrained from offering any testimony in his own behalf. Mention will hereafter be made in the opinion of such of the testimony as may be necessary to an understanding of the matters at issue on this appeal.

The report of the referee as modified and confirmed by the judge found that 37 illegal votes were cast and counted for the defendant, and concluded that the relator had been elected to the office in question by a majority of 17. Judgment was entered thereon on application of the relator adjudging that the defendant be ousted from the office of Clerk of the Superior Court of Tyrrell County, and that the relator be put in possession of it. The defendant thereupon appealed to this Court upon exceptions duly preserved to practically all the findings of fact, conclusions of law, and rulings made below.

R. Clarence Dozier, Willis Briggs, H. S. Ward, and John A. Wilkinson for the relator, appellee.

Ehringhaus & Ehringhaus for defendant, appellant.

ERVIN, J. The official certificate of election constituted *prima facie* evidence that the defendant was entitled to the office of Clerk of the Superior Court of Tyrrell County, and imposed on the relator the burden of establishing the grounds of his complaint. *Jones v. Flynt,* 159 N. C., 87, 74 S. E., 817; *Rodwell v. Rowland,* 137 N. C., 617, 50 S. E., 319; *Boyer v. Teague,* 106 N. C., 576, 11 S. E., 665, 19 Am. S. R., 547; *Roberts v. Calvert,* 98 N. C., 580, 4 S. E., 127. The referee and the judge have found that the relator has successfully met this burden. Their findings of fact are binding upon us if they are supported by evidence. *Lindsay v. Brawley,* 226 N. C., 468, 38 S. E. (2d), 528; *Thigpen v. Trust Co.,* 203 N. C., 291, 165 S. E., 720.

As modified and confirmed by the judge, the report of the referee contains findings to the effect that 35 of the 37 persons alleged to have cast illegal ballots in favor of the defendant were disqualified to vote in Tyrrell County because of nonresidence.

The qualifications of voters in this State are established by the Constitution. It is therein provided as a prerequisite to the right to vote that an elector "shall reside in the State of North Carolina for one year and in the precinct, ward, or other election district in which he offers to vote four months next preceding the election." N. C. Const., Art. VI, section 2. It has been held by this Court without variation that residence within the purview of this constitutional provision is synonymous with domicile, denoting a permanent dwelling place, to which the party, when absent, intends to return. *Hannon v. Grizzard,* 89 N. C., 115; *Boyer v. Teague, supra; Groves v. Comrs.,* 180 N. C., 568, 105 S. E.,

172; *Gower v. Carter,* 195 N. C., 697, 143 S. E., 513.   This constitutional provision applies primarily to an incoming person who is not permitted to exercise political rights until after he has been in the State and the voting precinct for the prescribed periods, and is not designed to disfranchise a citizen of the State when he leaves his home and goes into another State or into another county of this State for temporary purposes with the intention of retaining his home and of returning to it when the objects which call him away are attained.  *Hannon v. Grizzard, supra.*

It appears that each of the 35 persons now under consideration was registered in the precinct in Tyrrell County in which his ballot was cast in the election of 1946, and that he had his legal residence in such precinct within the meaning of Article VI, section 2, of the Constitution at the time his name was placed upon the registration books.  It is a well settled principle that when once established, a domicile is never lost until a new one is acquired.  *Hannon v. Grizzard, supra; Groves v. Comrs., supra;* 29 C. J. S., Elections, sec. 19.  It follows that each of these 35 persons was entitled to vote in Tyrrell County at the time in controversy unless he had changed his domicile at some time subsequent to his registration and prior to the election.

It is well established that "to effect a change of domicile, there must be an actual abandonment of the first domicile, coupled with an intention not to return to it, and there must be a new domicile acquired by actual residence at another place, or within another jurisdiction, coupled with the intention of making the last acquired residence a permanent home."  *In re Finlayson,* 206 N. C., 362, 173 S. E., 902; *In re Martin,* 185 N. C., 472, 117 S. E., 561.

The relator called virtually all of the 35 persons now under consideration to the stand for the avowed purposes of establishing that they had changed their domiciles from Tyrrell County to another state or to other counties in this State between the times of their respective registrations and the election of 5 November, 1946.  We have studied with extreme care the testimony of these witnesses and all of the other evidence in the 275 page record, and have reached the conclusion that the testimony is sufficient to sustain the findings that four of these persons, namely, J. H. Beck, Dewey Jones, Blanche Jones, and Fred Patrick were nonresidents of Tyrrell County on 5 November, 1946, but that there is no evidence in the record to support the findings of nonresidence with respect to the other 31 persons who are alleged to have lost their domiciles in Tyrrell County.   Uncontroverted testimony offered by the relator shows that each of these 31 persons had a permanent residence in the precinct of Tyrrell County wherein his ballot was cast within the purview of Article VI, section 2, of the Constitution; that he left his home in Tyrrell

County and went to another state or to another county in this State for temporary purposes; that he intended at all times to return to Tyrrell County when the temporary objects which had called him away were attained; and that he had at no time any intention of making the other state or the other county in this State his permanent home.

It is apparent that undue stress was placed in the hearing below upon the fourth and sixth rules prescribed by the Legislature for the guidance of registrars and judges of election in determining the residence of a person offering to register or vote. G. S., 163-25, subsections d and f. The meaning of the term "residence" for voting purposes, as used in Article VI, section 2, of the Constitution of North Carolina, is a judicial question. It cannot be made a matter of legislative construction. This is true because the Legislature cannot prescribe any qualifications for voters different from those found in the organic law. *Van Bokkelen v. Canaday*, 73 N. C., 198; *Smith v. Carolina Beach*, 206 N. C., 834, 175 S. E., 313.

The relator questioned the validity of the absentee ballots cast by 12 persons for the defendant on account of alleged defects or irregularities relative to the execution of the statutory affidavits which absent voters are required to make at the time of marking and sealing their votes. G. S., 163-57; G. S., 163-58. The evidence supports the findings that five of these absentee voters were not sworn. They were F. C. Everton, Minnie Everton, Ralph D. Godwin, Alonzo Reynolds, and Lillian Reynolds. Hence, the rejection of their ballots by the court below is upheld here. *Bouldin v. Davis*, 200 N. C., 24, 156 S. E., 103.

A similar ruling cannot be made, however, with respect to the 7 ballots challenged by the relator upon the ground that the oaths were not administered to the voters upon the Bible, but were taken by them with uplifted hands. We sustain the validity of the votes of these seven electors upon the authority of the well considered decision in *DeBerry v. Nicholson*, 102 N. C., 465, 9 S. E., 545, 11 Am. S. R., 767.

Four absent voters took and subscribed before the defendant in his capacity as Clerk of the Superior Court of Tyrrell County the affidavits which the statute requires absentee voters to take at the time of marking and sealing their ballots. G. S., 163-57; G. S., 163-58. The court below rejected these ballots and deducted them from the defendant's count upon the ground that the defendant's interest in his own re-election to the office of Clerk disqualified him to administer the oaths to these voters and vitiated their ballots. The testimony shows that the transactions were otherwise free from any basis for criticism or objection, and that the ballots under consideration expressed the free choices of the voters. It may be that a due sense of propriety would have induced the defendant to refrain from administering the oath to these voters. We are unable,

however, to concur in the ruling of the court rejecting these ballots. When he administered the oath to these electors, the defendant performed a simple and definite duty imposed by law regarding which nothing was left to his discretion. His act was ministerial and not judicial. *S. v. Knight,* 84 N. C., 790. It follows that his interest in the outcome of the election did not invalidate the ballots in question. 46 C. J., Oaths and Affirmations, section 6; *Lamagdelaine v. Tremblay,* 162 Mass., 339, 39 N. E., 38; *Evans v. Etheridge,* 96 N. C., 42, 1 S. E., 633.

For reasons hitherto stated, the court below properly discarded nine of the votes cast for the defendant. All of these rejected votes were cast by absent voters. We forego any further discussion with respect to these nine votes, and pass to the claim of the relator that 21 other absentee ballots were illegally voted for the defendant by persons sojourning in another state or in other counties of this State because of alleged misconduct of the Chairman of the Tyrrell County Board of Elections in delivering absentee ballots to such persons beyond the borders of Tyrrell County.

The question raised by this contention is a difficult one, necessitating a careful examination of our statutes relating to absentee voting. We undertake this task with the conviction that *Chief Justice Andrews* of the Court of Appeals of New York laid down a sound basis for judicial action in election contests when he declared: "We can conceive of no principle which permits the disfranchisement of innocent voters for the mistake, or even the willful misconduct, of election officials in performing the duty cast upon them. The object of elections is to ascertain the popular will, and not to thwart it. The object of election laws is to secure the rights of duly qualified electors, and not to defeat them." *People v. Wood,* 148 N. Y., 142, 42 N. E., 536.

The facts on this phase of the case are plain. Each of these absent voters was a duly qualified elector in Tyrrell County under Article VI, section 2, of the Constitution, and was duly registered in the voting precinct in which his absentee ballot was deposited, and was entitled to vote in such precinct at the general election on 5 November, 1946, under the statutes regulating absentee voting because he was then temporarily absent from Tyrrell County. G. S., 163-54.

Needham Brickhouse, the Chairman of the Tyrrell County Board of Elections, visited these 21 absent voters at their respective temporary residences in Norfolk, Virginia, or in Pasquotank, Perquimans, or Washington Counties, North Carolina. He was accompanied by the defendant, a candidate for re-election to the office of Clerk of the Superior Court of Tyrrell County, and by Earl Cahoon, the nominee of the defendant's party for the post of representative from Tyrrell County in the General Assembly. These circumstances, however, merit no great

stress because the testimony in the record does not suggest even remotely that any coercion, fraud, or imposition was practiced by anyone, or that the absentee votes here considered expressed anything except the free choices of the electors themselves.

These events occurred while Brickhouse was outside the territorial limits of Tyrrell County visiting these 21 absent voters at their respective temporary residences. They applied to him in person in the mode prescribed by G. S., 163-55, for absentee ballots to be voted by them in their respective precincts in Tyrrell County in the general election on 5 November, 1946. Pursuant to their applications, Brickhouse issued and delivered to these voters in person absentee ballots and container envelopes in the manner specified in the statutes. G. S., 163-55; G. S., 163-56; G. S., 163-57. The electors voted such ballots according to their personal choices before officers authorized to administer oaths in complete compliance with the procedure set out in G. S., 163-58, and delivered them in person to Brickhouse in securely sealed container envelopes.

After accepting delivery of the absentee ballots in person, Brickhouse carried them in unopened container envelopes to his office in Tyrrell County. Here he retained them in his custody as Chairman of the Tyrrell County Board of Elections in conformity to the pertinent statutes until the morning of the general election, when he delivered them in the unopened container envelopes to the registrars of the several precincts of Tyrrell County in which these absent voters were respectively registered. G. S., 163-58; G. S., 163-59; G. S., 163-60. Thereafter the election officials in these precincts opened the container envelopes, removed the absentee ballots therefrom, inspected the ballots, found them to be in due form, and voted and counted them in the manner prescribed by G. S., 163-61.

If it be legally permissible to add the events occurring outside Tyrrell County to those transpiring within its boundaries, the 21 absentee ballots now at issue were voted in literal compliance with the statutes governing absentee voting, except in the particular that the voters returned the ballots in person to the chairman of the county board of elections (a mode of return authorized by the statute for voters within the county) instead of mailing them to him (the method of return specified in the statute for voters absent from the county). G. S., 163-58. We are unwilling to hold, however, that this variation in the manner of the return of the ballots is sufficient of itself to invalidate these votes because it is inconceivable that the Legislature intended so to glorify form and crucify substance.

It was adjudged in the court below that the ballots cast by these 21 absent voters were illegal because Brickhouse's authority to act as Chairman of the Tyrrell County Board of Elections stopped at the boundaries

of Tyrrell County and the absentee ballots in question were delivered to these electors by Brickhouse in another state or in other counties of this State.

This view, we think, overlooks the primary purpose of the laws authorizing absentee voting and denies to the State its undoubted power to permit acts to be done outside its borders when the legal consequences of such acts are to take place within its boundaries. See *S. v. Scott,* 182 N. C., 865, 109 S. E., 789, where it is said: "We must not be understood as holding that the Legislature may not require certain official acts to be done beyond the State's limits, for it can legally do so, as for example in requiring depositions of witnesses or the acknowledgment of a deed or other instrument, to be taken in some other State, or even in a foreign country, and perhaps there are other illustrations of this legislative power."

The purpose of the statutes regulating absentee voting is to enable a qualified voter in a county of the State to vote at a general election in the precinct of his domicile when he is temporarily absent in another state or county. To effect this object, it may be necessary that an absentee ballot be placed in the hands of the absentee voter in the other state or county, that the absent voter perform the acts incident to voting the ballot on his part in the other state or county, and that the ballot be then returned from the absent voter in the other state or county to the precinct of his domicile in this State. Manifestly, the absentee voting law contemplates that the acts required by these procedures may be done in the other state or county where the absent voter is sojourning.

Our statutes relating to absentee voting prescribe methods for effecting the delivery and return of absentee ballots. G. S., 163-55; G. S., 163-56; G. S., 163-57; G. S., 163-58. There is nothing explicit or implicit in the statutes requiring or justifying the virtual disfranchisement of these 21 qualified voters of Tyrrell County because the Chairman of the Tyrrell County Board of Elections delivered the absentee ballots to them beyond the limits of Tyrrell County and returned such absentee ballots to the voting precincts of such voters in Tyrrell County after they had voted such ballots at their respective temporary residence outside of Tyrrell County. We hold that these ballots were cast in substantial compliance with the requirements of the statutes governing absentee voting. .

The relator insists, however, that the decision of the court below rejecting these ballots ought to be sustained here upon the ground that the Chairman of the Tyrrell County Board of Elections violated a due sense of propriety in performing the acts under review beyond the borders of Tyrrell County under the circumstances shown by the record. The answer to this assertion is that given by this Court to a similar contention in *Evans v. Etheridge, supra:* "That may be so, but the law does not provide otherwise, and it fixes the standard of legal propriety."

The evidence adduced by the relator was sufficient to justify the rejection of nine of the votes cast and counted for him, and to reduce the defendant's majority from 20 to 11. It was insufficient, however, to change the result of the election, and the motions made by the defendant in the court below for judgment of involuntary nonsuit ought to have been granted. For the reasons stated, the judgment entered below is
Reversed.