## THOMAS BELL v. HOMER GANNAWAY.

227 N. W. 2d 797.

March 28, 1975—No. 45336.

---

[5] See, Minn. St. 572.19, subd. 3. See, also, § 572.26, subd. 1(5).

*Berde, Leonard & Weinblatt* and *Alan W. Weinblatt,* for appellant.

*Popham, Haik, Schnobrich, Kaufman & Doty* and *Bruce D. Willis,* for respondent.

PETERSON, JUSTICE.

This is an appeal in a proceeding challenging the results of an election for town supervisor held in Grey Cloud Island Township, Washington County, on March 12, 1974.[1] The candidates

---

[1] The only other township office at the election was town clerk, which was uncontested.

for that office were contestant, Thomas Bell, and contestee, Homer Gannaway.

On March 13, 1974, the Grey Cloud Island Township canvassing board met and canvassed the election returns. The canvassing board certified that contestant received 101 votes and contestee received 102 votes. Contestant timely commenced an election contest proceeding pursuant to the provisions of Minn. St. c. 209, and there was procedural compliance by both parties to the contest.

The validity of seven ballots is put in issue by contestant. He contends that one ballot is invalid on its face because of identifying markings; two challenges are made to absentee ballots cast by a serviceman and his wife; four challenges (including that of the serviceman's wife) are made to the residence of named absentee voters; and one challenge is made to the manner in which a sixth absentee ballot was cast and counted. After a full trial, the trial court sustained the counting of all seven ballots, confirmed the vote tabulation of the canvassing board, and determined that contestee was duly elected. This appeal followed.

█ The ballot challenged on the basis of alleged identifying marks bears an "X" in the box before the name of contestee and a similar mark after his name. The challenge is based upon Minn. St. 204.22(k), which provides:

"When a ballot is so marked by distinguishing characteristics that it is evident that the voter intended to identify his ballot, the entire ballot is defective." [2]

The trial court ruled the ballot valid, and we agree.

We thoroughly reviewed and interpreted the statutory provisions relating to the marking of ballots in Fitzgerald v. Morlock, 264 Minn. 520, 120 N. W. 2d 339 (1963). We there held that when marks are made by a voter on a ballot in such a manner that it can reasonably be inferred that they were made in an attempt

---

[2] See, also, Minn. St. 204.11, subd. 3.

to indicate his choice of candidate, such marks should generally not be held to be identifying marks. We sustained the validity of a ballot which, as here, contained voting marks both before and after the name of a candidate (264 Minn. 537, 120 N. W. 2d 353):

"The trial court rejected ballot No. 67 because the voter placed crossmarks both before and after several candidates' names. The voter may have been overly cautious but we see no reason to conclude that he was attempting to identify his ballot intentionally. The provisions of § 204.22(d) apply.[3] Ballot No. 67 should have been accepted as valid, and its rejection is overruled."

It is clear that prior contrary case law relied upon by contestant has, at least sub silentio, been overruled by Fitzgerald. The policy considerations that support this holding are clear. Our statutes seek to give effect to the intention of the voter; a distinguishing mark on a ballot which requires rejection of the entire ballot is one that is placed there deliberately by the voter with intention to identify the ballot and not as a result of an honest effort to indicate his choice of candidates. As a result, not all marks and irregularities should be taken as identification of a ballot and grounds for rejecting it, Hanson v. Emanuel, 210 Minn. 271, 297 N. W. 749 (1941); Fitzgerald v. Morlock, *supra;* and a ballot should be upheld when it is consistent with innocence, good faith, and honest voting. Murray v. Floyd, 216 Minn. 69, 11 N. W. 2d 780 (1943).

■ The challenges to the absentee ballots of a serviceman and his wife were made on the ground that they had not complied with the provisions of Minn. St. 207.16 to 207.29. We hold that the trial court was correct in ruling that those statutory sections are not the exclusive method to be followed by servicemen and

---

[3] Minn. St. 204.22(d) provides: "When a mark (X) is made out of its proper place, but on or so near a name or space as to indicate clearly that the voter intended to mark the name, the vote shall be counted as so intended."

their families in voting by absentee ballot and that the provisions of §§ 207.02 to 207.10, generally applicable to absentee voters, are equally available to servicemen and their families. It is clear that the former sections are merely less restrictive or burdensome for the benefit of military personnel and that their use is not mandated.

■ Contestant challenges four ballots on the grounds that the voters were not legal residents of Grey Cloud Island Township and therefore were ineligible voters. The evidence as to residence varies as to each challenged voter, and no significant purpose would be served by a recitation of the various situations.

Residence, for purposes of voting, is determined by the statutory rules set out in Minn. St. 201.26. The guidelines established by this statute base residence upon considerations of physical presence and intent. See, generally, Putnam, *Conflict of Laws as to Domicil: The Restatement and Minnesota Decisions Compared,* 15 Minn. L. Rev. 668, 669. These are questions of fact and are to be addressed in the first instance to the trial court. We have repeatedly held that where the trial court makes findings of fact without a jury, such findings shall not be set aside unless clearly erroneous on the record as a whole. In re Estate of Balafas, 293 Minn. 94, 198 N. W. 2d 260 (1972); Rule 52.01, Rules of Civil Procedure. We cannot say that the trial court's findings were clearly erroneous, for we conclude that there was in each case evidence sufficient to support a finding that the challenged voters were residents of the township for voting purposes.

■ The last—and crucial—ballot in dispute involves a challenge to the procedures by which an absentee ballot was cast and counted. It is the most difficult issue because we are compelled to sustain the counting of a clearly invalid ballot on the sole ground of untimely challenge to it.

Minn. St. 207.08 provides detailed "DIRECTIONS TO VOTERS" for the purpose of absentee voting, the complete details of which

are stated in the margin.[4] The back of the "Return Envelope," which the voter is directed to sign, contains an oath, specified by Minn. St. 207.08, in these words:

"VOTER'S CERTIFICATE

County of ................... )
                              ) ss
State of .................... )

  "I do swear that I am a citizen of the United States; that I am

---

[4] The statutory "DIRECTIONS TO VOTERS" provides: "(1) Locate a Notary Public, United States Postmaster, Assistant United States postmaster, postal supervisor, clerk in charge of contract postal station, or any officer having authority to administer an oath or take an acknowledgment or an eligible voter in your county, who has voted in the last four years.

  "(2)  Exhibit the ballots to be voted on to such person unmarked.

  "(3)  In his presence mark the ballots in such a manner that he cannot see your vote. * * *

  "(4)  Fold each ballot separately so that your cross marks cannot be seen without unfolding, but so that facsimile signature of officer * * * on back of ballot can be seen without unfolding ballot. Do not put your name, initials, or any other identifying mark on the ballots.

  "(5)  Enclose all the ballots in the 'Ballot Envelope' and seal the envelope.

  "(6)  Sign your name on back of the 'Return Envelope.' The person taking your acknowledgment must sign his name as attesting witness, and, if he is an official, indicate his official title, insert proper date, and affix his official seal, or, in the case of postal authorities previously mentioned, the cancellation stamp of their respective post offices. When the person taking your acknowledgment is an eligible voter of your county he must state the fact below his signature. Insert the 'Ballot Envelope' in the 'Return Envelope' and seal the 'Return Envelope.'

  "(7)  Deposit the 'Return Envelope' in the mail in the presence of the attesting witness or have him do it for you.

  "(8)  The ballots may be marked and mailed at any time after you receive them from the county auditor or from the municipal clerk. However, they must be marked and mailed so that they can be delivered by the post office to the judges of election at your polling place before the polls close on election day."

an eligible voter; that I am an actual resident of the election precinct indicated by my address in my application; that I do not intend to abandon my residence in said precinct prior to such date; that at said time I will be a qualified voter in said precinct.

"(Signed)

. . . . . . . . . . . . . . . .   . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

"(Voter)"

And the statute provides this subscription by the attesting witness:

"Subscribed and sworn to before me this . . . . . . day of . . . . . . A.D. . . . . . . . . . . . . . . . . . . . ., and I hereby certify that the affiant exhibited the enclosed ballots to me unmarked; that he then in my presence and in the presence of no other person, and in such manner that I could not see his vote, marked such ballots and enclosed and sealed the same in the ballot envelope; or that he was physically incapacitated from marking his ballots and that at his request I marked the ballots for him; that the affiant was not solicited or advised by me for or against any candidate or measure.

. . . . . . . . . . . . . . . . . . . . . . . .   . .   . . . . . . . . . . . . . . . . . . . . . . . . .

"(Attesting Witness)"

It is obvious and undisputed that the absentee voter whose vote is challenged failed to follow the prescribed procedure. She simply did not sign the voter's certificate on the back of the return envelope. Neither did she exhibit her unmarked ballot to an attesting witness and mark her ballot in the presence of that person. On the contrary, the township clerk, who subscribed as attesting witness, did so before handing the ballot to the absentee voter's husband for delivery to her. The absentee voter, in short, never made the required oath of residence and eligibility. Although the trial court did not pass upon the issue, having based its decision on other grounds, the contestee concedes on oral argument that the ballot should not have been counted.

It is important, at the outset, to consider the nature of absentee

voting in the election process. The opportunity of an absentee voter to cast his vote at a public election by mail has the characteristics of a privilege rather than of a right. Since the privilege of absentee voting is granted by the legislature, the legislature may mandate the conditions and procedures for such voting. Wichelmann v. City of Glencoe, 200 Minn. 62, 273 N. W. 638 (1937). See, also, Ragan v. Burnett, 305 S. W. 2d 759 (Ky. 1957) ; De Flesco v. Mercer County Board of Elections, 43 N. J. Super. 492, 129 A. 2d 38 (1957) ; Frink v. State ex rel. Turk, 160 Fla. 394, 35 So. 2d 10 (1948); Miller v. Mersch, 152 Neb. 746, 42 N. W. 2d 652 (1950).

The preservation of the enfranchisement of qualified voters and of the secrecy of the ballot, the prevention of fraud, and the achievement of a reasonably prompt determination of the result of the election have been the vital considerations in the development of absentee voting legislation. As we said in Wichelmann v. City of Glencoe (200 Minn. 65, 273 N. W. 639) :

"The purpose of an election is to ascertain the will of the electorate. In order to secure a full and complete expression of the popular will, it is necessary not only that all voters who are qualified be permitted to vote, but also that only those who are entitled to vote be permitted to do so, and that a proper count and return be made. Laws relating to the registration of voters, secrecy of the ballot, and counting and returning the results of elections are designed to give the fullest expression to the will of the electorate at the polls and at the same time prevent illegal voting, frauds, and dishonesty in elections which frequently have defeated the will of the voters. The general election law provides that voting shall be by ballot in person in the regular polling places in the election districts. The absent voters law provides a way for voting by mail in cases in which the voters are absent from the district or are physically unable to go to the polls in person. The lawmaking power, being fully cognizant of the possibilities of illegal voting, frauds, and dishonesty in elections, prescribed many safeguards in the absent voters law to prevent such

abuses. While the purpose of the statute is to extend the privilege of voting, its provisions clearly indicate an intention not to let down the bars necessary for honest elections. Absentee voting is an exception to the general rule and is in the nature of a special right or privilege which enables the absentee voter to exercise his right to vote in a manner not enjoyed by voters generally. By the terms of the statute it is purely optional with the absentee voters whether they shall exercise the rights and privileges conferred upon them. If an elector decides to exercise the privilege of absentee voting, he can register and vote, by the terms of the law, only 'by complying with the provisions' thereof. [Minn. St. 207.02]."

In order to preserve the purity and integrity of elections, then, the absentee voter statutes, so far as the acts and duties of the voter are concerned, must be held to be mandatory in all their substantial requirements. These laws are not designed to insure a vote, but rather to permit a vote in a manner not provided by common law. As a result, voters who seek to vote under these provisions must be held to a strict compliance therewith. Thus, again from Wichelmann (200 Minn. 66, 273 N. W. 640):

"The provisions of election laws requiring acts to be done and imposing obligations upon the elector which are personal to him are mandatory. He is personally at fault if he violates them. If his vote is rejected for such violations, it is because of his own fault, not that of election officials. Such provisions prescribe mandatory conditions precedent to the right of voting. * * * Pennington v. Hare, 60 Minn. 146, 150, 62 N. W. 116; Truelsen v. Hugo, 81 Minn. 73, 83 N. W. 500; State ex rel. O'Hearn v. Erickson, 152 Minn. 349, 351, 188 N. W. 736. * * *

* * * * *

"* * * In In re Baker, 126 Miss. 49, 53, the court says:

" 'This absentee vote statute is in derogation of the general election law and should be strictly construed. Its provisions should be rigidly adhered to, otherwise the repeater, floater and

non-resident are given a free hand to gain results satisfactory to themselves. * * * The voter wishing to cast an absentee vote must comply with all the statutory demands and the power of the board of elections is held within those lines. * * * It cannot pass out absentee ballots at the mere asking. This would make fraud and vote buying too easy.' "[5]

See, also, Johnson v. Swenson, 264 Minn. 449, 119 N. W. 2d 723 (1963); Annotation, 97 A. L. R. 2d 218.

The mandate of the statute, Minn. St. 207.23, is clear and precise:

"* * * [N]o ballot contained in an Official Ballot Return Envelope in which the affidavit upon the back thereof is not properly executed shall be counted."

We hold that the failure of an absentee voter to properly execute his affidavit of residence and eligibility would require that the ballot be rejected if timely challenge is made.[6] The legislature has required all absentee voters to sign and have properly witnessed an oath of residence and eligibility; that oath is little

---

[5] In Wichelmann v. City of Glencoe, 200 Minn. 62, 273 N. W. 638 (1937), we held that the obligation of an absentee voter to file a verified application for a ballot was a material condition of the absentee voting provisions and was, therefore, a condition precedent to voting. As a result, we disallowed 26 votes based on the voters' failure to file their applications.

[6] Accord, Desjourdy v. Board of Registrars of Voters of Uxbridge, 358 Mass. 664, 266 N. E. 2d 672 (1971); Bullington v. Grabow, 88 Colo. 561, 298 P. 1059 (1931); State ex rel. Hutchins v. Tucker, 106 Fla. 905, 143 So. 754 (1932); Brown v. State ex rel. Stack, 227 Ind. 183, 84 N. E. 2d 883 (1949); Miller v. Hutchinson, 150 Me. 279, 110 A. 2d 577 (1954); Owens v. Chaplin, 228 N. C. 705, 47 S. E. 2d 12, rehearing (sought on grounds not pertinent here) denied, 229 N. C. 797, 48 S. E. 2d 37 (1948); Straughan v. Meyers, 268 Mo. 580, 187 S. W. 1159 (1916); Kaufmann v. La Crosse City Board of Canvassers, 8 Wis. 2d 182, 98 N. W. 2d 422 (1959); Fugate v. Mayor and City Council of Town of Buffalo (Wyo.) 348 P. 2d 76, 97 A. L. R. 2d 243 (1959). See, generally, Annotation, 97 A. L. R. 2d 243.

**356**

different in substance from the oath required of persons whose voting qualifications are in doubt when they vote in person. Minn. St. 204.17. The requirement of an absentee ballot oath represents an obvious attempt to insure, in a clear and forceful manner, that only properly qualified voters will exercise the privilege of absentee voting.

■ Nevertheless, we are compelled to hold, as did the trial court, that contestant's challenge to this absentee ballot came too late. The election judges did not reject the ballot, as provided by Minn. St. 207.11,[7] but deposited the ballot in the ballot box [8]

---

[7] Minn. St. 207.11 provides in relevant part: "The judges in the several precincts at any election shall receive all ballots delivered to them on election day by officers or employees of the United States post office department in due course of the business of that department or by the clerk of the municipality, and as herein provided, and deposit the same in the appropriate ballot box provided that they are satisfied that the person is a voter in such precinct and entitled to vote therein at such election; provided, further, that the conditions precedent hereinafter set forth, exist. Ballots so deposited shall be counted, canvassed and returned and shall be given the same force and effect as the votes of other duly qualified voters who vote in person.

"Upon a 'Return Envelope' being delivered to the judges they shall open the same in such a manner as not to cut or mutilate the contents or deface or damage the certificate or the signatures thereto on the outside thereof. They shall compare the signature of the voter on the outside of the 'Return Envelope' with the signature on the 'Application for Ballots' delivered to them as provided herein. If the judges or a majority of them, shall be satisfied that the signature of the voter subscribed to the 'Voter's Certificate' is the genuine signature of the person who made the 'Application for Ballots,' and if the signature of the voter has been properly authenticated as prescribed in the 'Directions to Voters' set forth in this chapter, the judges, or one or more of them shall write the word 'Received' on such 'Ballot Envelope' * * *. If the ballots are not received for the reason that the voter has failed to comply with the requirements herein set forth or has previously voted at such election, then such 'Ballot Envelope' shall be marked 'Rejected' and placed in the 'Return Envelope' and placed with and returned to the county auditor with the unused ballots."

[8] This was not a simple oversight, for the judges had observed that the return envelope had not been signed by the absentee voter. They

and thereby commingled it with all other ballots. This well may not have occurred, however, had contestant availed himself of his statutory right to appoint a challenger to be in attendance during the voting and canvass of the results.[9] The challenger, of course, would have had the right to inspect the return envelope as it related to the eligibility of the absentee voters.[10] Had a challenger been present and challenged the absentee ballot, the default need not have occurred; had the challenger not challenged the ballot on the authorized ground of nonqualification of the absentee ballot, the present challenge would have been barred.

The legislature made such provision in Minn. St. 204.11, subd. 4:

"The voter and the ballots of any absent voter at any time before the ballots have been deposited in the ballot boxes are subject to a challenge by the judges or by any person who was not present at the time the voter procured the ballots, but not other-

---

reasoned that, because the township at this election had voter registration cards for the first time, the original and duplicate registration cards for absentee voters were being returned along with the white ballot envelope in the return envelope, so that there would be two additional signatures of the voter which could be compared with that on the application for the absentee ballot. (It is now known, indeed, that the absentee voter would have been in fact eligible to vote had she personally appeared at the place of voting.) This was, as noted in the text, an insufficient reason for receiving the ballot, although it mitigates any inference of willful misconduct by the judges.

[9] Minn. St. 204.16, subd. 2, provides: "At any election each nonpartisan candidate may appoint by written certificate, and the judges shall permit, one voter at a time for each nonpartisan candidate for each precinct to be in the polling place while the election is being held and to remain with the election board until the votes are canvassed and the results declared, to act as challenger of voters."

[10] This function is analogous to the challenger's role with respect to nonabsentee voters, Minn. St. 204.17, and is not inhibited by the provisions of § 204.06, prohibiting challengers from handling or inspecting registration cards, files, or lists.

wise. The question shall be determined in the same manner as is provided for the challenge of voters, and if the voter or the ballots of any absent voter are found to be disqualified, the ballots so prepared shall be placed unopened among the spoiled ballots." [11]

This statute, to be sure, is not wholly free from ambiguity with respect to its use of the phrase, "but not otherwise." It may arguably be read, as contestant would read it, to prohibit postelection challenges only by a person who was present at the time the voter procured his ballot. We construe the statute, however, to mean that an absentee ballot may not be challenged at any time after the ballot has been deposited in the ballot box. The implication of our reading is that only facially invalid ballots may be subject to postelection challenges. Our reading is fortified by three considerations. First, this appears to be the meaning ascribed to it by the Legislative Interim Commission on Election Laws at the time of the comprehensive 1959 revision:

"COMMENT: This subdivision embodies the substance of 206.13. This subdivision indicates that the proper time to challenge a voter is when the voter obtains his ballots. Afterwards, only the judges themselves or someone who was not present previously can challenge the ballots. Also, it is just before the ballots are to be deposited into the boxes that the absent voters' ballots are challenged." Report of Interim Comm. on Election Laws 1959, p. 93.

Second, at the time a ballot is to be cast, only the qualifications of the voter are subject to challenge, Minn. St. 204.17; the markings of the ballot itself (except for the inapplicable provisions of § 204.13) are secret from both challenger and judges, pur-

---

[11] Under New York Election Law, § 330, subd. 4, (McKinney 1964), a court may not entertain a challenge to absentee ballots where no protests or objections have been made to them on election day. In re Commerdinger, 246 App. Div. 834, 284 N. Y. S. 872, affirmed, 270 N. Y. 657, 1 N. E. 2d 984 (1936).

suant to § 204.14 and 207.08, "DIRECTIONS TO VOTERS," items (3) and (4). Third, when ballots are facially invalid they are capable of segregation and recount. This is true with respect to any ballot, whether cast in person or as an absentee voter. But the deduction of a vote cast by absentee ballot has the potential of a double deduction, for an absentee ballot deducted on grounds of eligibility may, at the same time, be a ballot subject to rejection on grounds of facial invalidity. We think the legislature may well have had these practical considerations in mind in the enactment of § 204.11, subd. 4.[12]

Affirmed.

OTIS, JUSTICE (dissenting).

I cannot agree that a ballot which is characterized by the majority as "clearly invalid" should determine the outcome of an election (as it quite obviously does in this case), where the

---

[12] Our dissenting colleagues suggest that our reading of Minn. St. 204.11, subd. 4, contextually with § 204.16, subd. 2 (appointment of challengers or "poll watchers"), is "completely unrealistic." The burden of appointing challengers in a statewide election is undoubtedly great, but we understand that the major political parties have from time to time made extensive (although probably not complete) use of this statutory right. Here, however, the election included just one precinct, not nearly 4,000 precincts; so, given the "hotly contested and bitterly conducted election" in that one precinct, the elemental precaution of appointing a challenger was hardly a burden. The role of the challenger, of course, is not limited to an examination of absentee ballots. We think the potential for fraud in the absence of challengers may not be as grave as the dissenting opinion intimates. Allegations of fraudulent conduct by election judges have been rare in this state, the personal rectitude of the judges being reinforced by criminal sanctions of the kind provided in § 210.15. The failure of the election judges in this case, as observed in footnote 8, was not suggestive of fraud, and upon publication of today's decision, there should be no occasion for a repetition of such mistake anywhere in the state. If we, on the other hand, are mistaken in our reading of the statute, the legislature can make needed clarification of the statute prior to the next statewide election.

invalidity is the result of the voter herself flagrantly violating the law.

To permit this decisive ballot to be counted condones an abuse which undermines a fundamental safeguard in the election process. It opens the door to the distinct possibility that the ballot will be used by someone other than the person for whom it was intended. Here, the blank absentee ballot was handed to the applicant's husband. There was no evidence whatever that his wife actually cast the vote.

In my opinion, to require that the challenge be made before the absentee ballot is counted leads to a completely unrealistic process which would impose an intolerable burden on candidates running for statewide office. It would make it mandatory that in all of nearly 4,000 precincts poll watchers be designated to examine absentee ballots before they are opened. I cannot believe that this was the intention of the legislature in prescribing procedures for absentee voting.

I recognize that by excluding this invalid ballot the person to whom it was issued would be required to divulge the manner in which she cast her vote, if indeed she did vote. Nevertheless, she has forfeited her right to secrecy by willfully violating the law. If the question as to how she voted remains in doubt, competent evidence of her preelection position with respect to the candidates would, in all likelihood, be available to the parties.

Whatever may be the difficulties inherent in rejecting the ballot, the alternatives are no better. The effect of the majority decision is to permit the outcome of an election to be determined by a patently unlawful process, since there is no serious question but that the illegal vote was cast for the winning candidate.

This was a hotly contested and bitterly conducted election affecting matters of fundamental municipal policy on which the community was deeply divided. Notwithstanding the fact that the rejection of the illegal ballot would result in a tie vote and that the election would then be decided by the toss of a coin, such procedure would at least give effect to the election laws, main-

tain the integrity of the ballot, and allow the controversy to be resolved in a democratic manner.

SHERAN, CHIEF JUSTICE (dissenting).
I agree with the views of Mr. Justice Otis.

MACLAUGHLIN, JUSTICE (dissenting).
I join the dissent of Mr. Justice Otis.