CASS COUNTY, Respondent,

v.

WRIGHT COUNTY, Appellant,

Ann Wynia, Commissioner of Human Services, Crow Wing County, Respondents.

No. C6–92–1160.

Court of Appeals of Minnesota.

Dec. 8, 1992.

Earl E. Maus, Cass County Atty., Jon P. Eclov, Asst. Cass County Atty., Walker, for Cass County.

Wyman A. Nelson, Wright County Atty., Brian J. Asleson, Asst. Wright County Atty., Buffalo, for Wright County.

Hubert H. Humphrey, III, Atty. Gen., Laura Sue Schlatter, Sp. Asst. Atty. Gen., St. Paul, for Ann Wynia, Com'r of Human Services.

John Remington Graham, Crow Wing County Atty., Brainerd, for Crow Wing County.

Considered and decided by RANDALL, P.J., and KALITOWSKI and DAVIES, JJ.

## OPINION

RANDALL, Judge.

Respondent Cass County filed a CHIPS petition on behalf of T.P., a fifteen-year-old female, on November 21, 1989. On November 22, 1989, Cass County district court ordered the CHIPS petition transferred to appellant Wright County district court. In April 1990, Cass County Social Services (CCSS) requested that Minnesota Department of Human Services (DHS) determine the county of financial responsibility for T.P. On September 7, 1990, DHS determined Cass County was financially responsible. Cass County appealed to the Cass County district court, which reversed, finding Wright County to be financially responsible. Wright County appeals. We reverse.

## FACTS

T.P. (d.o.b. May 27, 1974) lived with her mother in Crow Wing County until June 1989. While there, the mother received Aid to Families with Dependent Children and other social services through Crow Wing County, such as an out-of-home placement for T.P. In June 1989, T.P. and her mother left Crow Wing County. The family's Crow Wing County AFDC file was closed on July 1, 1989, and their Crow Wing County social service file was closed on August 31, 1989. The mother moved to Monticello, Minnesota in Wright County and married.

The record does not indicate if T.P. moved with her mother to Wright County.

On October 4, 1989, T.P. was discovered by police living at the home of Edward Lawrence Carlson and his mother in Pillager, Minnesota. Pillager is in Cass County. Edward Carlson had been convicted of third degree criminal sexual conduct involving a fourteen-year-old female in May 1987. He was on probation at the time T.P. was found living at his home, but under the terms of his probation he was not restricted from contact with female children.

T.P. was arrested on a Crow Wing County juvenile delinquency warrant, transported to Crow Wing County, and placed in the Port group home in Brainerd. Crow Wing Social Services commenced a CHIPS petition on October 6, 1989, and opened a social services file on T.P., which was closed on November 7, 1989. On October 20, 1989, T.P. was placed in a Crow Wing County foster home. There was a hearing on the CHIPS petition on November 6, 1989 in Crow Wing district court. The trial court learned that T.P.'s mother had moved to Wright County. The court transferred the CHIPS petition to Wright County and ordered T.P. to live with her mother in Wright County. There is no evidence T.P. ever lived with her mother in Wright County, before or after the court order. The mother later told a Cass County investigator that T.P. lived with the Carlsons from November 6, 1989, the day she was ordered to live with her mother, until she was again removed from that home.

On November 17, 1989, T.P. was again discovered by police at the Carlson home. Carlson's mother showed the officers a notarized statement written by T.P.'s mother which purported to give the Carlsons custody of T.P. The officers executed a 72–hour–hold and again placed T.P. at the Port group home in Brainerd. Cass County commenced a CHIPS petition on November 21, 1989, alleging that T.P. was medically neglected, was without adequate parental care, was living in a dangerous environment, and was a habitual truant. On November 22, 1989, Cass County district court transferred the petition to Wright County. T.P. was placed in the temporary custody of CCSS until she could be transferred to Wright County. The court also ordered T.P. not to have contact with Edward Carlson.

Wright County questioned whether it was the county of financial responsibility for T.P., but on November 30, 1989, assumed financial responsibility for her and placed her in a Wright County foster home. However, Wright County billed Cass County for services provided to T.P. On April 17, 1990, CCSS asked DHS to determine which county was financially responsible for T.P. DHS determined Cass County was responsible. Cass County appealed to district court. The trial court reversed, finding Wright County was the county of financial responsibility for T.P. Wright County appeals.

## ISSUE

Did the trial court err by finding Wright County to be the county of financial responsibility for T.P.?

## ANALYSIS

■ Residence and financial responsibility determinations for human services programs, including social services such as foster care, are governed by Minn.Stat. ch. 256G (1990) (Minnesota Unitary Residence and Financial Responsibility Act). Minn. Stat. § 256G.01, subd. 3 (chapter applies to programs in which residence is the determining factor in establishing financial responsibility). This case involves statutory interpretation, a question of law. On appeal, a reviewing court need not defer to a trial court's determination of a legal question. *See Frost–Benco Elec. Ass'n v. Minnesota Pub. Utils. Comm'n,* 358 N.W.2d 639, 642 (Minn.1984).

T.P. was placed in a Wright County foster home. Time spent in a foster home is "excluded time," and is not used to determine residence. Minn.Stat. § 256G.02, subd. 6. Respondent does not dispute that foster home time is excluded in determining the county of financial responsibility. For an applicant who resides in a foster home, "county of financial responsibility" is defined as "the county in which the applicant last resided in a nonexcluded sta-

tus immediately before entering the facility." Minn.Stat. § 256G.02, subd. 4(c). Therefore, the issue in this case is where T.P., the applicant, resided before she was placed in foster care.

T.P. was found living in Cass County at the Carlson home before she was placed in foster care. There is no evidence T.P. ever actually lived in Wright County until she was placed in foster care. DHS found Cass County was the county of financial responsibility because the "Carlson home, whatever the circumstances, is the last place she lived in an unexcluded setting." The trial court reversed and found Wright County to be the county of financial responsibility. The trial court found that since Crow Wing County district court had released T.P. to the custody of her mother who resided in Wright County, T.P.'s presence in Cass County was in violation of that order, and T.P.'s chosen residence should not be determinative. The trial court reasoned that the Crow Wing County district court order sending T.P. to her mother established T.P.'s residency.

Appellant Wright County analogizes this case to *Bell v. Gannaway*, 303 Minn. 346, 350, 227 N.W.2d 797, 801 (1975), which discusses residence for voting purposes in terms of physical presence and intent. Voting statutes define a person's residence as "where the individual lives and usually sleeps." Minn.Stat. § 200.031(h) (1990). Appellant argues T.P. lived and usually slept at the Carlson home in Cass County, and had no intent to leave. However, residence for voting purposes presumes the person involved is an adult, not a minor. We do not rely upon *Bell* as a part of our analysis, but hold that appellant prevails for other reasons.

Determining residence for a minor involves different considerations than adults. For example, in *In re C.J.L.*, 379 N.W.2d 722, 723 (Minn.App.1986), this court interpreted a juvenile's residence status for venue purposes. In that case, a juvenile was placed in Red Wing Correctional Facility in Goodhue County. *Id.* at 722. After he was paroled, he was placed with his mother in Hennepin County. Nine days later, he was sent back to Red Wing to await a revocation hearing, where the next day he struck another juvenile. He was charged in Hennepin County for that offense. *Id.* at 723. Venue for juvenile court proceedings could be brought in the county of his residence or the county where the alleged delinquency occurred. Minn.Stat. § 260.121, subd. 1 (1984). The juvenile argued he was a resident of Goodhue County, where the assault occurred, and could only be charged in that venue. *Id.*

This court interpreted the term residence to give the " 'meaning which will best effectuate the objects and purpose of the statute.' " *Id.* (quoting *In re Guardianship of Kowalke*, 232 Minn. 292, 302, 46 N.W.2d 275, 282 (1950)). The court noted the purpose of the juvenile code is to "strengthen family ties whenever possible." Minn.Stat. § 260.011, subd. 2 (1984).

> Implicit in an entire reading of the juvenile code is that the term "residence" refers to the community where the young person comes from and will return to after punishment. Residence should be interpreted to mean where the child resides on a permanent basis with his or her parent(s) rather than where a judge or the Commissioner of Corrections has ordered the child temporarily.

*C.J.L.*, 379 N.W.2d at 723. Therefore, the court found residence for the juvenile to be synonymous with domicile and affirmed the venue in Hennepin County where his mother lived. *Id.; see also Kowalke*, 232 Minn. at 302–03, 46 N.W.2d at 282 (county where the juvenile is domiciled is proper place to begin guardianship proceedings). In T.P.'s situation the legislature has determined that a minor's residence *must be* determined independently from the parents' residence under Minn.Stat. § 256G.10. Formerly, minors could not establish residence except through their parents in a process called "derivative settlement." *County of Ramsey v. County of Sherburne*, 281 N.W.2d 888, 890 (Minn.1979). In that case, the Minnesota Supreme Court determined the county of financial responsibility of an unemancipated minor was not determined by the county where the minor was physically present, but the county of the minor's parents' residence. *Id.* The court was interpreting Minn.Stat. § 256D.18, subd. 2(a) (1974) to determine the county of financial responsibility for the minor. Because that

statute did not specifically mention minors and because the legislature had not explicitly stated an intention to change that rule, the court found the common law rule of derivative settlement applied. *County of Ramsey*, 281 N.W.2d at 890. In 1987, the legislature *changed* the rule. Minn.Stat. § 256D.18 was repealed by 1987 Minn. Laws ch. 363, § 14 (effective January 1, 1988), the same chapter which implemented chapter 256G.

Under chapter 256G, *derivative settlement was eliminated.*

> The residence of the parent or guardian does not determine the residence of the child or ward. Physical or legal custody has no bearing on residence determinations.

Minn.Stat. § 256G.10. Therefore, the fact that T.P. was ordered to live in Wright County with her mother is not determinative. Respondent Cass County attempted to clothe their oral argument with different versions, but it continued to come out in the wash as derivative settlement.

The trial court erred by relying on the Crow Wing County district court's order releasing T.P. to the custody of her mother to determine her county of residence for financial responsibility purposes. The law is clear. The county of financial responsibility is the county where T.P. last resided immediately before she entered foster care in October 1989 and November 1989. *See* Minn.Stat. § 256G.02, subd. 4(c). " 'Reside' means to have an established place of abode in one state or county and not to have an established place of abode in another state or county." Minn.Stat. § 256G.02, subd. 8. Abode is not defined in chapter 256G, but is commonly defined as a place of dwelling. *See* Black's Law Dictionary 7 (6th ed. 1990). There must be some indication a person intends to stay in a location, or has no present intent to leave, for it to be a residence or an abode.

There is no evidence T.P. ever lived in Crow Wing County after June 1989 except during short term foster home stays. Time spent in foster homes is excluded from consideration for purposes of determining residency. Minn.Stat. § 256G.02, subd. 6. There is no evidence T.P. ever entered

Wright County or intended to stay there. Her location is not clear from the time she left Crow Wing County in June 1989 until she was discovered in Cass County on October 4, 1989. After she was released to her mother's custody on November 6, 1989, she was allowed to return to Cass County and apparently remained there until she was again discovered on November 17, 1989. T.P. did not go with her mother to Wright County. T.P.'s mother stated to a Cass County investigator that T.P. lived with the Carlsons from November 6, 1989, the day she was ordered to live with her mother, until she was again removed from the Carlson home. The only place T.P. had a place of dwelling before entering foster care was in Cass County with the Carlsons. We do not know how long T.P. lived in Cass County before she was found there in October 1989, but she apparently lived there from November 6, 1989 until November 17, 1989. There is no waiting period for establishing residence under chapter 256G. Minn.Stat. § 256G.03, subd. 2. We agree with the Department of Human Services. Cass County is the county of financial responsibility for T.P., not Wright County or Crow Wing County.

The dissent argues there must be a finding that T.P. lived in Cass County for two months in order to change the county of financial responsibility from Crow Wing County, citing Minn.Stat. § 256G.07, subd. 1. We agree with the dissent that the record does not establish that T.P. was in Cass County for a consecutive two month period. However, Minn.Stat. § 256G.07, subd. 1 applies to a person who is receiving services in one county, and then moves to a new county. The previous county must pay for the services for two months before the new county becomes financially responsible. T.P. had not received any services in Crow Wing County since June 1989. When she was discovered in Cass County in October 1990 she was not receiving services from any county. Therefore, the two month requirement under Minn.Stat. § 256G.07, subd. 1 is inapplicable. Since no waiting period is required to establish residency under Minn.Stat. § 256G.03, subd. 2, Cass County was T.P.'s residence and the county of financial responsibility.

Cass County's concern that the determination of the county of financial responsibility for juveniles will be unnecessarily complicated by this decision is unfounded. The controlling legislation is clear, and we find no evidence of problems since January 1, 1988, when the law was passed. Social service workers will not have to ascertain runaway juveniles' latest "one night flops" in order to determine residency. This case did not involve an ordinary runaway juvenile who had been missing from a parent's home for a short time where she had admittedly resided by intent and presence before being found. In such cases, the juvenile's residence for financial responsibility purposes would likely be the same as the parents. That case is not before us. T.P. had essentially been abandoned and was not living with her mother. Rightly or wrongly, her choice was to live in Cass County and her physical presence was in Cass County. The statute mandates that T.P.'s residence, for financial responsibility purposes, must be determined independently from her parents.

## DECISION

Pursuant to Minn.Stat. § 256G.10 (1990), T.P.'s residence must be determined independently from her mother's residence. T.P. was living in Cass County before she entered foster care. Cass County is the county of financial responsibility for T.P.

Reversed.

DAVIES, Judge (concurring in part, dissenting in part).

I concur entirely with the decision to reverse the district court order. Wright County cannot be held to be the residence of T.P. under Minnesota Statutes chapter 256G.

I would, however, remand to the trial court for a determination of the financial responsibility as between Crow Wing County and Cass County. Minn.Stat. § 256G.07, subd. 1, requires that, to change the county of obligation from one county to another, there be an uninterrupted two-month residence in the new county. There was no finding to that effect in the district court order. Until that finding is made, the residence remains in Crow Wing County and Crow Wing County continues to be the county bearing financial responsibility for T.P. I do not find evidence in the record showing that T.P. established a residence for any consecutive two-month period in Cass County.

Further, as a matter of policy, a county should not escape financial responsibility for the social services needed by a juvenile like T.P. by simply losing track of her, as Crow Wing County did here.