Mike ERLANDSON, John Eisberg, and
Mollie Lorberbaum, Petitioners,

v.

Mary KIFFMEYER, Minnesota Secretary of State, and Patrick H. O'Connor, Hennepin County Auditor/Treasurer, individually and on behalf of all County and Local Election Officers, Respondents,

Kathleen T. Blake, Michael J. Blake, Tom Kelly, and Ron Eibensteiner, individually and on behalf of the Republican Party of Minnesota, Intervenor–Respondents.

No. C7–02–1879.

Supreme Court of Minnesota.

April 17, 2003.

Alan W. Weinblatt, Weinblatt & Gaylord, PLC, St. Paul, MN, for Petitioner.

Michael A. Hatch, Attorney General, State of Minnesota, for Mary Kiffmeyer, Minnesota Secretary of State, Respondent.

Lori R. Swanson, Deputy Attorney General, Kristine L. Eiden, Deputy Attorney General, St. Paul, MN, for Mary Kiffmeyer, Minnesota Secretary of State, Respondent.

Amy Klobuchar, Hennepin County Attorney, Patrick C. Diamond, Assistant County Attorney, for Patrick H. O'Connor, Hennepin County Auditor/Treasurer, individually and on behalf of all County and Local Election Officers, Respondents.

Tony P. Trimble, Matthew W. Haapoja, Jeffrey C. O'Brien, Trimble & Associates, Ltd., Minneapolis, MN, for Kathleen T. Blake, Michael J. Blake, Tom Kelly, and Ron Eibensteiner, individually and on behalf of the Republican Party of Minnesota, Respondents.

## OPINION

BLATZ, C.J.

Petitioners, three individuals, including the chair of the Democratic Farmer Labor Party, brought this action under Minn. Stat. § 204B.44 (2002) against the Minnesota Secretary of State and the Hennepin County Auditor/Treasurer.[1] They sought relief regarding alleged errors, omissions and wrongful acts of respondents related to the then-upcoming election for United States Senator at the general election on November 5, 2002, following the death of Senator Paul Wellstone on October 25, 2002. Petitioners requested an order that would: (1) instruct the secretary of state to inform absentee voters of their right to obtain replacement ballots; (2) instruct local election officials to distribute replacement ballots to eligible voters who so requested; (3) instruct the secretary of state to print the supplemental ballot using the optical scan format with instructions in Hmong, Russian and Spanish and to have the ballots counted by optical scan machines; and (4) instruct that all distribution and receipt of ballots with Senator Paul Wellstone's name on them be stopped immediately pending an order allowing replacement ballots.

Petitioners filed and served the petition on October 29, 2002. The court issued an order that day requiring responses by 1:00 p.m. on October 30 and set argument for October 31 at 10:00 a.m. Four individuals, including the candidate of the Republican Party of Minnesota for attorney general and the chair of the Republican Party of Minnesota, filed a motion to intervene to oppose some of the relief requested in the petition. That motion was granted by order filed on October 31, 2002.[2]

---

1. The petition states that the county auditor/treasurer is named on behalf of all county and local election officials.

2. In addition to Senator Wellstone, the absentee ballot listed the following candidates: Norm Coleman, Republican Party; Jim Moore, Independence Party; Ray Tricomo, Green Party, and Miro Drago Kovatchevich, Christian Constitution Party.

The case was argued on October 31. At argument, the court was informed that earlier that morning the Democratic–Farmer–Labor (DFL) Party had filed papers nominating Walter Mondale as its replacement candidate for the United States Senate. By order filed October 31 we granted some of the relief requested, particularly with respect to mailing of replacement ballots to absentee voters who had been mailed absentee ballots before Senator Wellstone's death and who requested a replacement absentee ballot and supplemental ballot. Because of the urgency of the situation, the order was issued with opinion to follow.

The event that gave rise to this case was the death of Senator Paul Wellstone in a plane crash on October 25. Senator Wellstone was the DFL candidate for United States Senator in the general election to be held on November 5. His death created a vacancy on the ballot. Minn.Stat. § 204B.13, subd. 1(a) (2002). State election law authorizes a major political party to name a replacement to fill a vacancy in nomination of that party's candidate for partisan office. Minn.Stat. § 204B.13, subd. 2 (2002). In the event of a vacancy caused by the death of the candidate, the nomination certificate for the replacement candidate must be filed within seven days after the vacancy occurs, but no later than four days before the general election. *Id.*, subd. 2(b).

Minnesota Statutes § 204B.41 (2002) prescribes the process for conducting the election when a vacancy on the ballot created by the death or catastrophic illness of a candidate occurs after the 16th day before the general election.[3] Most important is the provision for preparation of an "official supplemental ballot," a separate paper ballot to be used for the race in which the vacancy occurred. This supplemental ballot is to accompany the regular ballot, on which the affected race must be crossed out. It is the interpretation and implementation of the procedures required by section 204B.41 that are at issue in this case.

I.

The petition alleged numerous errors, omissions and wrongful acts. They can be categorized generally into three groups: (1) issues relating to the form and method of counting supplemental ballots; (2) issues relating to the conduct of the election process; and (3) issues relating to advice the secretary of state was giving voters relating to this election. At oral argument, counsel for petitioners indicated that

3. Minn.Stat. § 204B.41 provides:

When a vacancy in nomination occurs through the death or catastrophic illness of a candidate after the 16th day before the general election, the officer in charge of preparing the ballots shall prepare and distribute a sufficient number of separate paper ballots which shall be headed with the words "OFFICIAL SUPPLEMENTAL BALLOT." This ballot shall contain the title of the office for which the vacancy in nomination has been filled and the names of all the candidates nominated for that office. The ballot shall conform to the provisions governing the printing of other official ballots as far as practicable. The title of the office and the names of the candidates for that office shall be blotted out or stricken from the regular ballots by the election judges. The official supplemental ballot shall be given to each voter when the voter is given the regular ballot or is directed to the voting machine. Regular ballots shall not be changed nor shall official supplemental ballots be prepared as provided in this section during the three calendar days before an election. Absentee ballots that have been mailed prior to the preparation of official supplemental ballots shall be counted in the same manner as if the vacancy had not occurred. Official supplemental ballots shall not be mailed to absent voters to whom ballots were mailed before the official supplemental ballots were prepared.

with the nomination of a replacement candidate, petitioners' request for an order enjoining further distribution of regular absentee ballots[4] until the official supplemental ballot was available was moot. In addition, counsel for the secretary of state stated that the parties had reached agreement on all issues related to the form of the official supplemental ballot and the method of counting those ballots, as well as most other issues raised in the petition. The remaining issues, as presented at oral argument, focused on treatment of regular absentee ballots cast before the vacancy occurred and distribution of supplemental ballots to voters to whom regular absentee ballots had already been sent.

Petitioners first addressed their request for relief concerning regular absentee ballots that had been returned by the voter to election officials before the vacancy occurred. Section 204B.41 states that "[a]bsentee ballots that have been mailed prior to the preparation of official supplemental ballots shall be counted in the same manner as if the vacancy had not occurred." According to the statute, for regular absentee ballots sent back prior to the vacancy, the vote for United States Senator counts for the candidate selected on the ballot. This means that votes for Senator Wellstone would be counted for him, not for the replacement candidate. Petitioner argued that issues of due process and equal protection were raised because votes of those who cast these ballots for Senator Wellstone would not count for a candidate who could be elected, but votes for other candidates on the ballot would. To avoid those constitutional issues, petitioners urged the court to interpret the statute as

requiring that votes on those absentee ballots *for all other offices* be counted as if the vacancy had not occurred, but that no votes for United States Senator would be counted from those ballots. Petitioners further proposed that the court order distribution of absentee supplemental ballots by the most expeditious means possible to all voters who had requested absentee ballots in order to allow all of those voters to recast their ballots for United States Senator. This issue was not raised in the petition; nor was this form of relief requested in the petition.

At oral argument, petitioners proposed another alternative form of relief that also was not included in their petition. As with the previous proposal, in this alternative all voters who had been mailed a regular absentee ballot would be sent a replacement absentee ballot that included a supplemental ballot for the Senate race.[5] Unlike the petitioners' first proposal, in this alternative, votes for United States Senator cast on regular absentee ballots would be counted if no replacement ballot was returned by the voter.

However, section 204B.41 states that "[o]fficial supplemental ballots shall not be mailed to absent voters to whom ballots were mailed before the official supplemental ballots were prepared." Despite this apparent statutory bar to mailing replacement absentee ballots, petitioners argued that this court could order the blanket mailing by adopting a judicial presumption that absentee ballots cast prior to the vacancy were spoiled ballots subject to replacement under Minn.Stat. § 203B.06, subd. 3 (2002). Section 203B.06, subdivision 3, provides in relevant part: "Only

---

4. The phrase "regular absentee ballots" is used in this opinion to refer to absentee ballots with Senator Wellstone listed as the DFL candidate for United States Senator.

5. The phrase "replacement absentee ballot" is used in this opinion to refer to a second regular absentee ballot sent to a voter with the U.S. Senate race crossed out and accompanied by an official supplemental ballot.

one set of ballots may be mailed or delivered to an applicant for any election, except as provided in section 203B.13, subdivision 2, or *when a replacement ballot has been requested by the voter for a ballot that has been spoiled* or lost in transit." (Emphasis added.) Petitioners argued that in these unique circumstances the requested judicial presumption that the ballots were spoiled would supplant the statutory requirement of a request by the voter for a replacement ballot and allow a replacement supplemental ballot to be sent automatically to *all* absentee voters to whom a ballot had previously been sent. According to petitioners, if the voter did not return the replacement supplemental ballot, the presumption that the regular ballot was spoiled would have been rebutted and the regular ballot should be counted.

As a third alternative form of relief, petitioners requested that replacement absentee ballots should be mailed to any voters *who requested them,* despite the prohibition in section 204B.41 against mailing replacement ballots. This request was also based on the spoiled ballot theory, but rather than a judicial presumption, the trigger for mailing the replacement ballot would be the voter's request, as provided in section 203B.06. This relief was requested in the petition.

Thus, the relief requested by petitioners at the hearing was a series of three alternative courses of action:

1) Order replacement ballots, including official supplemental ballots, sent to all applicants for regular absentee ballots for the general election and count only replacement ballots returned in time for the election. Regular absentee ballots cast would not be counted for United States Senator regardless of which candidate received the vote.

2) Order replacement ballots sent to all applicants for regular absentee ballots and count replacement ballots if returned and regular ballots for voters who do not return a replacement ballot.

3) Order replacement ballots mailed to all applicants for regular absentee ballots who request a replacement ballot and count the replacement ballot if returned in time for the election.

Intervenors requested at the hearing that distribution of regular absentee ballots not be curtailed to await production of supplemental ballots so that voters would not be deprived of the opportunity to vote in other races due to the delay in distribution of absentee ballots and proximity of the election.

## II.

▮▮▮▮ The petition in this case was brought under Minn.Stat. § 204B.44, which allows any person to file a petition to correct or prevent certain types of errors, omissions or wrongful acts related to elections. The statute lists several specific types of errors related to preparation of ballots and has a catch-all section for "[a]ny wrongful act, omission, or error of any election judge, municipal clerk, county auditor, * * * the secretary of state, or any other individual charged with any duty concerning an election." Minn.Stat. § 204B.44 (d) (2002). In assessing whether the conduct challenged was an error, omission or wrongful act, we must interpret and apply the applicable election statutes. Our review must be informed by the recognition that "[n]o right is more precious in a free country than that of having a voice in the election of those who make the laws under which, as good citizens, we must live. Other rights, even the most basic, are illusory if the right to vote is undermined." *Burson v. Freeman,* 504 U.S. 191, 199, 112 S.Ct. 1846, 119 L.Ed.2d

5 (1992) (quoting *Wesberry v. Sanders*, 376 U.S. 1, 17, 84 S.Ct. 526, 11 L.Ed.2d 481 (1964)). "The right to vote * * * is a fundamental and personal right essential to the preservation of self-government." *State ex rel. South St. Paul v. Hetherington*, 240 Minn. 298, 303, 61 N.W.2d 737, 741 (1953). Indeed, it is this paramount importance of the right to vote that imbues the state with a compelling interest in preserving the orderliness and integrity of the election process. *See Burson*, 504 U.S. at 199, 112 S.Ct. 1846.

A primary issue in the petition was the contention that it was improper for election officials to continue to distribute and accept regular absentee ballots that listed Senator Wellstone as a candidate after his death created a vacancy on the ballot. Petitioners requested in their memorandum in support of the petition an order stopping the distribution of regular absentee ballots immediately. The intervenors opposed that relief. At oral argument petitioners stated that their request for an immediate halt to distribution of regular absentee ballots was moot, because the nominating papers for the replacement candidate had been filed. Intervenors argued nevertheless that county election officials should be ordered to continue distributing absentee ballots as promptly as possible so that voters would not lose the opportunity to vote due to delay in receiving the ballot. Because it appeared that supplemental ballots would be available before or shortly after the pre-election order of this court would issue, the court considered the requests to either stop or continue distribution of regular absentee ballots pending the availability of supple-

mental ballots moot, and those requests were therefore not addressed in the court's order.

As noted, petitioners introduced for the first time at oral argument their request for an order providing that votes for United States Senator on regular absentee ballots would not be counted, although votes on those ballots for all other offices would be counted.[6] Other than simply asserting that counting regular absentee ballots cast for candidates other than Wellstone would raise due process and equal protection issues, petitioners presented no further rationale to support this requested relief, nor did they cite any legal authority for their position. The secretary of state responded that this issue was not raised in the petition and that the plain language of section 204B.41 requires that regular absentee ballots be counted as if no vacancy had occurred. Intervenors argued that votes for United States Senator on regular absentee ballots already returned cannot be ignored. To ignore those votes, intervenors argued, would improperly disenfranchise voters who had voted for a candidate other than Senator Wellstone and had cast their absentee ballots in accordance with and in reliance on the applicable statutes.

Based on the parties' arguments we see no sound legal basis on which to grant the relief of not counting votes for candidates for United States Senator cast on regular absentee ballots. The language of section 204B.41 providing that such ballots shall be counted as if no vacancy occurred requires that those votes be counted. While at first blush it may seem unfair to the replacement candidate to count votes for

---

**6.** The proposed order filed by petitioners at the hearing provided, however, that *write-in* votes for United States Senator on regular absentee ballots *would* be counted. This proposed relief would have had the effect of excluding votes for candidates whose names

appeared on the ballot, because there would be no incentive to write in their names, while counting write-in votes, which presumably would be primarily for candidates whose names did not appear on the ballot, such as the replacement candidate.

other candidates from regular absentee ballots on which the replacement candidate did not appear, those are properly cast ballots voting for a properly nominated candidate who remains eligible for election. The governing statute plainly provides for the counting of such votes, and petitioners have cited no authority that would justify, much less require, the discarding of those votes, especially when those voters might not have the opportunity to cast a replacement ballot due to the proximity to the election. We also acknowledge that absentee voters who voted for Senator Wellstone on a regular absentee ballot before his death may not have sufficient time to recast their ballot. But we must recognize that in the unfortunate circumstances presented, a perfect solution that enables all absentee voters an opportunity to cast a replacement ballot may not be possible. The fact that some Wellstone voters may be disenfranchised because of the Senator's untimely death does not, without strong legal authority, support disenfranchising voters who have properly cast ballots for other candidates who remain on the ballot. Accordingly, petitioners' request that the court order that votes for United States Senator cast on regular absentee ballots not be counted is denied.

■ Petitioners proposed two additional alternatives that would provide absentee voters an opportunity to re-vote, but that unlike their previously described proposal would count votes on regular absentee ballots only if no replacement ballot were cast. The first of these alternatives was to send replacement ballots to *all* absentee voters to provide them with an opportunity to re-vote on a supplemental ballot that lists the replacement candidate. The second alternative was to mail replacement ballots to absentee voters who requested them.

To receive either of these forms of relief, petitioners must overcome the sentence in section 204B.41 that states: "Official supplemental ballots *shall not be mailed* to absent voters to whom ballots were mailed before the official supplemental ballots were prepared." (Emphasis added.) Petitioners argued that the secretary of state improperly advised local election officials based on this sentence of section 204B.41 that they could not mail a replacement absentee ballot or an absentee supplemental ballot to a voter to whom they previously sent a regular absentee ballot. Petitioners contended this disenfranchised voters who already returned their regular absentee ballots and then wanted to vote for the DFL replacement candidate, but could not go to the polling place to vote on election day or go to the local election official before then to personally obtain a new ballot. Petitioners offered both a statutory and a constitutional basis on which they claimed replacement ballots could be mailed to absentee voters despite the mailing prohibition in section 204B.41.

Petitioners' statutory argument was based on Minn.Stat. § 203B.06, subd. 3 (2002), which authorizes an election official to mail a second absentee ballot to a voter "when a replacement ballot has been requested by the voter *for a ballot that has been spoiled* or lost in transit." (Emphasis added.) Petitioners contended that an absentee ballot cast with a vote for Senator Wellstone is a spoiled ballot because that vote is no longer valid, arguing that "[a] ballot is considered spoiled if the vote would be invalid as cast." Without citation of authority, petitioners invited the court to establish a judicial presumption that all regular absentee ballots were spoiled and on that basis order that replacement ballots be sent to all voters to whom regular absentee ballots were sent earlier. If a replacement ballot was cast by a voter, that ballot would supersede a regular bal-

lot previously returned by that voter. If no replacement ballot was cast, the regular ballot cast would be counted.

Neither statute nor caselaw defines what makes a ballot "spoiled." At oral argument, petitioners asked the court to adopt a presumption that all votes for United States Senator cast on regular absentee ballots were spoiled, although votes for all other races would be counted. In their memorandum, petitioners defined a spoiled ballot as one that would be invalid as cast, and therefore any ballot with a vote for Paul Wellstone in petitioners' view would be spoiled. However, petitioners offered no authority for either definition of spoiled ballot. Rather, they offered at oral argument only the factual assertion of counsel, albeit supported by respondent Hennepin County Auditor/Treasurer, that at the polls a voter who has inadvertently voted for the wrong candidate can obtain a replacement ballot—treating the original ballot as spoiled.

In her memorandum to the court, the secretary of state pointed out that there is no definition of "spoiled ballot" in the statutes. Relying upon other statutes that use the term, she concluded that spoiled ballot is used "to describe situations where a ballot has been subject to unlawful or inappropriate conduct by the voter." The secretary contended that votes for Paul Wellstone cast before his death were not mistaken or improper and therefore the ballots cannot be considered spoiled.

Another problem with petitioners' statutory argument is that a well-established canon of statutory construction requires that the more particular statute that prohibits mailing of supplemental ballots to voters who previously received a regular absentee ballot supersede the more gener-al statute that provides for replacement of spoiled ballots. See Minn.Stat. § 645.26, subd. 1 (2002) (stating that when statutes are in conflict, particular statute prevails over the general).

 Alternatively, petitioners argued in their memorandum in support of the petition that to deny replacement ballots to those who requested them would violate equal protection, because replacement ballots were available under Minn.Stat. § 203B.16–.27 (2002) to absentee voters in the military and living temporarily overseas. At oral argument the equal protection issue was discussed from a different perspective. The parties apparently were in agreement that a voter who previously was mailed a regular absentee ballot could obtain a replacement absentee ballot by going to their local election official to pick one up or could vote at the polls on election day. Thus, voters who could pick up a replacement absentee ballot or could get to the polls could re-vote, but absent voters who only had access to a replacement absentee ballot through the mail could not re-vote, because section 204B.41 prohibits mailing a replacement ballot. The question is whether this differential treatment created by the section 204B.41 ban on mailing replacement absentee ballots violates the equal protection rights of voters who previously were sent a regular absentee ballot and who could not pick up a replacement ballot personally or get to the polls. The secretary of state's counsel acknowledged at oral argument that this discrimination is neither logical nor fair. More importantly, for the reasons that follow, by treating similarly-situated voters differently with no rational explanation, the statute violates equal protection guarantees.[7]

---

7. Our general practice is to avoid a constitutional ruling if there is another basis on which a case can be decided. *E.g., In re Senty-Haugen,* 583 N.W.2d 266, 269 n. 3 (Minn.

A first step in equal protection analysis is to determine whether the challenged classification must satisfy strict scrutiny or merely the rational basis standard. A restriction that either dilutes the effectiveness of some citizens' votes or denies the franchise to citizens who are otherwise qualified by residence and age, "receive[s] close scrutiny from the Court." *Kramer v. Union Free Sch. Dist. No. 15*, 395 U.S. 621, 626, 89 S.Ct. 1886, 23 L.Ed.2d 583 (1969). When reviewing a statute that denies "some residents the right to vote, the general presumption of constitutionality afforded state statutes and the traditional approval given state classifications if the Court can conceive of a 'rational basis' for the distinctions made are not applicable." *Id.* at 627–28, 89 S.Ct. 1886.

On the other hand, where only the ability to vote by absentee ballot, and not the right to vote generally, has been at issue, the United States Supreme Court has applied rational basis analysis. *See McDonald v. Board of Election Comm'rs of Chicago*, 394 U.S. 802, 89 S.Ct. 1404, 22 L.Ed.2d 739 (1969). In *McDonald*, the Court concluded that an Illinois statute that denied unconvicted jail inmates absentee ballots did not restrict the inmates' right to vote, but rather only restricted the inmates' claimed right to an absentee ballot, because there was no evidence that jail officials would not provide another means for the inmates to vote. Because the fundamental right to vote was not at issue, the Court declined to apply strict scrutiny and required only that the statute "must bear some rational relationship to a legitimate state end." *Id.* at 809, 89 S.Ct. 1404.[8]

In a subsequent case, inmates eligible to vote challenged New York's absentee voter statute that did not permit them to receive absentee ballots, and the Supreme Court noted the state had also denied the inmates transportation to the polls. *O'Brien v. Skinner*, 414 U.S. 524, 525, 94 S.Ct. 740, 38 L.Ed.2d 702 (1974). The Court's opinion in *O'Brien* did not expressly state which standard of scrutiny it applied, but the Court found that the restriction on absentee ballots was "wholly arbitrary" because there was no rational basis for denying inmates confined within their resident counties absentee ballots when inmates confined outside their resident counties were entitled to absentee ballots. 414 U.S. at 530, 94 S.Ct. 740. In his concurrence,

---

1998). But in the circumstances of this case, prudence dictates that we deviate from our usual practice. A decision based on petitioners' statutory argument would require that we define for the first time what constitutes a spoiled ballot. Whatever definition was selected could have broad ramifications in a variety of other electoral circumstances. We are reluctant to embrace a specific definition of spoiled ballot based on the limited record available, lacking both factual development of the current practice regarding spoiled ballots other than unsworn anecdotal statements of counsel presented at argument and examination of the consequences of adopting a particular definition in other circumstances not presently before the court.

 Conversely, a ruling based on the constitutional issue has narrow impact. The ruling is limited to the particular circumstances presented in this case and affects only one sentence of section 204B.41, which section itself is only applicable to the unusual circumstances of a vacancy created by the death or catastrophic illness of a candidate after the 16th day before the general election.

8. In a similar vein, in a case challenging an absentee ballot on the grounds that it was not executed in conformity with the law, we stated that the opportunity to vote by absentee ballot "has the characteristics of a privilege rather than of a right." *Bell v. Gannaway*, 303 Minn. 346, 354, 227 N.W.2d 797, 802 (1975). Because absentee voting is a privilege, the court concluded that the legislature could "mandate the conditions and procedures for such voting." *Id.*

Justice Marshall stated that because, unlike in *McDonald*, there was evidence in *O'Brien* that the inmates would not otherwise be able to vote, the denial of absentee ballots infringed on their right to vote and thus triggered strict scrutiny. *Id.* at 532–33, 94 S.Ct. 740 (Marshall, J., concurring).

We need not resolve whether strict scrutiny or rational basis review is the proper standard here, because in the circumstances of this case the restriction on mailing replacement ballots imposed by Minn. Stat. § 204B.41 cannot survive even the lower level of scrutiny. For voters who cast their regular absentee ballots for Wellstone before the vacancy occurred but were unable to go to their polling place on election day or visit an election official's office before election day to pick up a replacement ballot, the prohibition on mailing replacement ballots in section 204B.41 prevented them from obtaining a supplemental ballot and denied them the right to cast a meaningful vote for United States Senator. Neither the secretary of state nor the Hennepin County Auditor/Treasurer suggested any rationale for the statutory prohibition on mailing replacement absentee ballots to persons who had already been mailed regular absentee ballots. Because voters who mailed in their regular absentee ballots could obtain a replacement ballot in person either at their local election official's office or at the polls, the state's interest in not mailing replacement ballots cannot be based on concern about people voting twice or controlling

voter fraud. Intervenors suggested at argument that the purpose for the prohibition may be to avoid voter confusion, but the risk of confusion from mailing a replacement ballot with appropriate instructions seems no greater than providing one to the voter in person.

The purpose of the absentee ballot is to enfranchise those voters who cannot vote in person. To prohibit mailing of replacement absentee ballots to absentee voters who continue to be unable to vote or pick up a ballot in person disenfranchises the very people the absentee voter laws are intended to benefit. In the total absence of any rational explanation, allowing some absentee voters to revote with replacement ballots but denying that opportunity to the very group for which absentee voting is designed by prohibiting the mailing of replacement absentee ballots is a denial of equal protection that requires remedial action.

Hence, our October 31, 2002, order was based on the conclusion that equal protection required election officials to make an effort to enfranchise absentee voters who previously cast their regular absentee ballots and were unable to obtain a replacement absentee ballot in person either before or on election day. Election officials therefore were required to mail a replacement ballot (consisting of the regular absentee ballot with the Senate race crossed out and an official supplemental ballot) to any absentee voter who requested one.[9]

---

**9.** We limited this relief to those absentee voters who requested a replacement ballot, rather than extending it to *all* absentee voters as requested by petitioners. First, even the "spoiled ballot" statute on which petitioners relied requires a request from the voter before a replacement ballot is made available. Minn.Stat. § 203B.06, subd. 3. More importantly, requiring distribution of replacement ballots to all absentee voters would undoubtedly entail mailing ballots to many voters who

did not desire to re-vote. Such relief would unnecessarily increase the scope of the additional burden imposed on election officials just days before the election and at the same time increase the risk of confusing voters about the need to re-vote. *Cf. Mattson v. McKenna*, 301 Minn. 103, 108, 222 N.W.2d 273, 277 (1974) (stating that in the absence of clear legislative direction, the court will not order corrective action in cases of alleged errors in election ballots unless it is satisfied

To avoid confusion, the replacement ballot was required to be accompanied by clear instructions explaining what would occur if a replacement ballot was cast. If a replacement ballot was returned in time to local election officials, the regular absentee ballot previously returned would not be counted. The voter was therefore instructed to vote for all races in which he or she intended to vote on the replacement and supplemental ballot.

These same principles required similar relief to absentee voters in health care facilities and voters who had voted by mail prior to the vacancy but who could not obtain a replacement ballot in person. Accordingly, the court's order contained provisions for distribution of replacement absentee ballots to absentee voters in health care facilities under Minn.Stat. §§ 203B.06, subd. 3(c) and 203B.11(2002) and replacement mail ballots to voters in communities that vote by mail under Minn. Stat. § 204B.45 (2002).

Petition granted in part, denied in part.

PAGE, Justice (concurring in part and dissenting in part).

The right to vote is protected in more than the initial allocation of the franchise. Equal protection applies as well to the manner of its exercise. Having once granted the right to vote on equal terms, the State may not, by later arbitrary and disparate treatment, value one person's vote over that of another.
*Bush v. Gore,* 531 U.S. 98, 104–05, 121 S.Ct. 525, 148 L.Ed.2d 388 (2000).

While I concur in the court's reasoning and the result reached with respect to whether the prohibition against mailing supplemental ballots violates the equal protection rights of voters requesting re-

placement ballots, I respectfully dissent from the court's decision relating to that part of Minn.Stat. § 204B.41 which provides that "[a]bsentee ballots that have been mailed prior to the preparation of official supplemental ballots shall be counted in the same manner as if the vacancy had not occurred."

I dissent because the issue is not properly before the court for resolution and therefore should not be addressed. At oral argument, petitioners for the first time requested that the court issue an order requiring that *no* votes for United States Senator cast on regular absentee ballots be counted. Petitioners argued that counting regular absentee ballots only for candidates other than Senator Wellstone raised due process and equal protection concerns. That issue was not raised in the parties' petition or argued in any party's memorandum. Moreover, in raising this issue at oral argument, petitioners did not provide any legal authority in support of their position. The court, nonetheless, addresses the issue. Because the issue was not properly raised, briefed, or argued, it should not be addressed. *See Morrow v. LaFleur,* 590 N.W.2d 787, 796 n. 15 (Minn.1999) (declining to address an issue that was not briefed by the parties and only addressed at oral argument).

I also dissent because the court's decision on the merits goes too far. Although the court may be correct in its conclusion that the remedy sought by petitioners is not proper, the proper remedy cannot be one in which some voters must necessarily be disenfranchised. Implicit in the court's resolution is the suggestion that there is no constitutional problem with the "shall be counted in the same manner" language of Minn.Stat. § 204B.41. In fact, there are fundamental problems with allowing the

that the change can be made in an acceptable way within the time available and at a reason-

able cost, considering the danger of unfairness at issue).

votes for United States Senator on some regular absentee ballots to be counted while not counting others. *See Bush,* 531 U.S. at 104–05, 121 S.Ct. 525.

While not properly before the court, the issue as raised presents a fundamental constitutional question that reaches to the very core of democracy: the right of citizens to have their votes counted. Yet the court, ignoring this question, resolves these constitutional concerns without any citation to authority or law. These concerns should not have been so casually raised nor so cavalierly dismissed.

Therefore, I concur in part and dissent in part.

GILBERT, Justice (concurring in part).

I join in Justice Page's concurrence, but not the dissent.

GILBERT, Justice (concurring).

I generally agree with the result reached by the majority but join Justice Page in his concurrence, but not his dissent. We should not address issues not properly raised or briefed in a timely fashion and without appropriate citation to authority. The petition filed in this case only addressed errors in the supplemental ballot form and lack of information to those who may want to request a replacement ballot. Those include not having an "oval target" as did the regular ballot; no place for dates or judges' initials; generally confusing instructions; incorrect and confusing directions to voters who already voted absentee; and erroneous and incomplete directions from the Secretary of State to local election officials and absentee voters. These were the only complaints that were set forth in the petition wherein corrective action was requested. These are the only issues that we should address.

My concern with the petitioners' request for relief at oral argument relates to their

suggestion to disregard all regular absentee ballots cast for U.S. senate. If we granted such relief, assuming there was proper authority to do so, it would only compound the problem that the petitioners are attempting to address on behalf of the DFL Party. Their proposal, carried out to the extreme, would void numerous properly filled out and filed absentee ballots sent on behalf of the four other nominated candidates, plus any write-in candidates for this office. The end result reached by the majority, based on this tragic accident and the short time frame before Election Day, is fair to the absentee voters who voted for the late Senator Paul Wellstone, without impinging upon the voting rights of those of our citizens who had voted for the other four candidates or chosen to write in the name on the regular absentee ballots.