Ken MARTIN and Erik Simonson,
Petitioners,

v.

Donald DICKLICH, Saint Louis Coun-
ty Auditor, and Mark Ritchie, Minne-
sota Secretary of State, Respondents.

No. A12–1588.

Supreme Court of Minnesota.

Dec. 5, 2012.

Charles N. Nauen, David J. Zoll, Julie A. Strother, Lockridge Grindal Nauen, P.L.L.P., Minneapolis, MN, for petitioners.

Mark S. Rubin, Saint Louis County Attorney, James T. Nephew, Assistant County Attorney, Duluth, Minnesota, for respondent Donald Dicklich.

Lori Swanson, Attorney General, Alan I. Gilbert, Solicitor General, Michael Everson, Assistant Attorney General, Saint Paul, Minnesota, for respondent Mark Ritchie.

Sara K. Van Norman, R. Reid LeBeau, II, Jacobson, Buffalo, Magnuson, Anderson, and Hagen, P.C., Saint Paul, Minnesota, for Travis Silvers.

## OPINION

PER CURIAM.

Ken Martin and Erik Simonson filed a petition pursuant to Minn.Stat. § 204B.44 (2010). Petitioners seek an order requiring that respondents Donald Dicklich, the St. Louis County Auditor ("the County Auditor"), and Mark Ritchie, the Minnesota Secretary of State, place Simonson's name on the ballot for the 2012 general election as the candidate of the Democratic–Farmer–Labor ("DFL") Party for the office of State Representative for House District 7B. Petitioners contend that the County Auditor erred by refusing to accept the Affidavit of Withdrawal submitted by DFL-nominated candidate Kerry Gauthier and the Affidavit of Candidacy submitted by newly nominated DFL candidate Simonson for the general election in District 7B. Because we concluded that Minnesota law required Simonson's name to be placed on the ballot, we issued an order on September 25, 2012 granting the petition, with this opinion to follow.

The facts are undisputed. Incumbent Gauthier was the only DFL candidate to file for candidacy for state representative in District 7B, and therefore, he was nominated for the general election without a primary. See Minn.Stat. § 204D.03, subd. 3 (2010). On August 21, 2012, Gauthier received, after all primary election results were certified, a Notice of Nomination from the State Canvassing Board. See Minn.Stat. § 204C.32, subd. 2 (2010).

On August 22, 2012, Gauthier announced that he intended to withdraw from the election. On September 6, 2012, Gauthier submitted to the County Auditor an Affidavit of Withdrawal. The County Auditor refused to accept the Affidavit and returned it to Gauthier.

On September 8, 2012, the DFL local committee ("Senate District 7 Committee") convened an endorsing convention, revoked Gauthier's nomination, and then endorsed Simonson as the DFL-nominated candidate for District 7B. On September 10, 2012, the DFL submitted a Nomination Certificate to the County Auditor stating that Simonson had been nominated to fill the vacancy left by Gauthier's withdrawal. The County Auditor refused to accept the Nomination Certificate, stating that he did not have the statutory authority to do so.

On September 10, 2012, Martin and Simonson filed a petition with our court pursuant to Minn.Stat. § 204B.44, alleging that the County Auditor erred in the ballot preparation process. The alleged error was the County Auditor's refusal to remove Gauthier's name from the 2012 general election ballot and replace it with Simonson's name as the DFL-nominated candidate for District 7B. We issued a scheduling order the next day requiring the parties to submit briefs. In addition, petitioners were directed to address the issue of laches. All parties and District 7B Republican Party candidate Travis Silvers submitted briefs.

Petitioners argue that based on two statutory provisions, Minn.Stat. §§ 204B.12 (2010) and 204B.13, subds. 1 and 2 (2010 and Supp.2011), the County Auditor was required to remove Gauthier's name as the DFL candidate for state representative for District 7B on the 2012 general election ballot and substitute in its place Simonson's name. Respondents contend that these same statutory provisions do not allow Gauthier to withdraw and therefore do not allow Simonson's name to be substituted for Gauthier's on the general election ballot. Respondents also argue that laches should bar the relief sought.

Finally, respondent Mark Ritchie contends that we should dismiss him from this proceeding because the petition did not allege any wrongful acts by his office.

## I.

■ We turn first to the request by Secretary of State Ritchie to be dismissed from this proceeding. In naming Secretary Ritchie as a respondent, petitioners alleged that the Secretary of State is "responsible for the administration of elections," "issues rules" regarding election administration, and "provides guidance to [ ] local election officials" for election administration. Petitioners therefore named Secretary Ritchie as a "necessary party." Secretary Ritchie, however, notes that the petition alleges no wrongful acts by him related to the candidate withdrawal and substitute nominee events at issue here. Thus, he contends, he is not a proper party to this proceeding. Further, he points out that any potential relief is available only from the County Auditor, who is responsible for ballot preparation and printing. Secretary Ritchie concludes that he is not a proper party because the County Auditor is a party to this proceeding.

■ Minnesota Statutes § 204B.44 allows a person to seek correction of any error or omission committed by a "county auditor, canvassing board, ... the secretary of state, or any other individual charged with any duty concerning an election." Minn.Stat. § 204B.44 (d) (2010). The petition must "describe the error, omission, or wrongful act," and be served "on the officer, board or individual charged with the error, omission, or wrongful act." *Id.* The proceeding authorized by section 204B.44 thus allows potential candidates, among others, to seek relief from the errors and omissions "of those enumerated

persons charged with properly completing the procedural and mechanical duties attendant to the election process." *Schroeder v. Johnson,* 311 Minn. 144, 145, 252 N.W.2d 851, 852 (1976).

The Secretary of State took no direct actions with respect to Gauthier's request to withdraw from the ballot and Simonson's request to have his name substituted on the ballot for the vacancy created by Gauthier's withdrawal. Those requests were properly directed to the County Auditor because Gauthier filed his affidavit of candidacy with that election official. *See* Minn.Stat. § 204B.09, subd. 1(d) (2010) (stating that affidavits of candidacy can be filed with the secretary of state or "the county auditor of the county in which the candidate resides"); Minn.Stat. § 204B.13, subd. 2(a) (2010) (stating that a vacancy in nomination can be filled by filing a "nomination certificate with the same official who received the affidavits of candidacy for that office"). Nevertheless, the Secretary of State retains a role in the ballot preparation process. For example, a county auditor prepares a ballot only after the Secretary of State has certified "the names of the nominees" to the auditor. Minn.Stat. § 204C.32, subd. 2. And the county auditor prepares the ballot "subject to the rules of the secretary of state." Minn.Stat. § 204D.11, subd. 1 (2010). Finally, as petitioners allege, the Secretary of State, as the chief election official for the state, is "responsible for the administration of elections," "issues rules" regarding election administration, and "provides guidance to [ ] local officials" for election administration.

Given the Secretary's role in ballot preparation, we cannot say that he is not a proper party here.[1] Joinder of multiple

---

1. In arguing that he is not a "proper" party, Secretary Ritchie appears to invoke the man-

datory joinder requirements of Minn. R. Civ. P. 19. Although Rule 19 previously used the

defendants is permissible when there is a "right to relief with respect to or arising out of the same transaction, occurrence, or series of transactions or occurrences and if any question of law or fact common to all defendants will arise in the action." Minn. R. Civ. P. 20.01. Joinder rules, we have noted, "reflect[ ] pragmatic concerns for the efficient use of judicial resources." *State Auto. & Cas. Underwriters v. Lee,* 257 N.W.2d 573, 575 (Minn.1977); *see also Bacich v. Northland Transp. Co.,* 173 Minn. 538, 540, 217 N.W. 930, 931 (1928) (in explaining statutory authority for joinder, noting that joinder of multiple defendants may be permissible even though all defendants may not be "equally interested in or affected by the action," but were "all interested in" the issues raised by plaintiff's claim for relief) (citation omitted) (internal quotation marks omitted).

Here, the Secretary's interests in ballot preparation and election administration are implicated by petitioners' request for relief. Indeed, as the state official that has previously administered elections with ballot vacancies and substitutions, *see generally Erlandson v. Kiffmeyer,* 659 N.W.2d 724, 726, 731 (Minn.2003); *Clark v. Growe,* 461 N.W.2d 385, 386 (Minn.1990), it is logical to assume that county election officials who are required to prepare ballots subject to the Secretary's rules would turn to the Secretary of State for guidance in this situation. In addition, to the extent that relief is available from the deadlines set by federal election officials, the Secretary of State is the only state official with the authority to request that relief. 42 U.S.C. § 1973ff–1(g)(1) (Supp. IV 2010)

(stating that the chief election official of a state applies for a waiver under Uniformed and Overseas Citizens Absentee Voting Act). Thus, pragmatic concerns related to the orderly administration of elections are best served by the Secretary of State's participation as a party in this proceeding. We therefore deny Secretary Ritchie's request to be dismissed from this action.

## II.

Next, we consider whether laches should bar the relief petitioners seek. "Laches is an equitable doctrine applied to 'prevent one who has not been diligent in asserting a known right from recovering at the expense of one who has been prejudiced by the delay.'" *Winters v. Kiffmeyer,* 650 N.W.2d 167, 169 (Minn.2002) (quoting *Aronovitch v. Levy,* 238 Minn. 237, 242, 56 N.W.2d 570, 574 (1953)). We have on occasion declined to hear an election challenge on grounds of laches. *See Clark v. Pawlenty,* 755 N.W.2d 293, 297–98, 303 (Minn.2008) (declining a challenge to a primary ballot filed 24 days before the primary); *Marsh v. Holm,* 238 Minn. 25, 28–29, 55 N.W.2d 302, 304 (1952) (declining to consider merits of challenge to candidate's name as it appeared on general election ballot, where candidate used same name on primary election ballot). In so holding, we have recognized that the "expeditious consideration and disposition" compelled by challenges to the form and content of a ballot require that a challenger move without delay to assert known rights. *Peterson v. Stafford,* 490 N.W.2d 418, 419 (Minn.1992).

terms "indispensable," "necessary," and "proper" to describe a party's status, since 1968 those terms have been replaced by a two-step, multi-factor analysis used to determine the necessity and feasibility of joinder. *See* 1 David F. Herr & Roger S. Haydock, *Minnesota Practice—Civil Rules Ann.* § 19:3

(5th ed.2009). Because joinder is permissible here, we do not decide whether the mandatory joinder rules require the Secretary of State to always be joined as a respondent in a petition brought under Minn.Stat. § 204B.44 (2010).

The " 'practical question in each case is whether there has been such an unreasonable delay in asserting a known right, resulting in prejudice to others, as would make it inequitable to grant the relief prayed for.' " *Winters*, 650 N.W.2d at 170 (quoting *Fetsch v. Holm*, 236 Minn. 158, 163, 52 N.W.2d 113, 115 (1952)). And we consider whether a "reasonable valid excuse" demonstrates that the petitioner could not have acted more expeditiously. *Marsh*, 238 Minn. at 28, 55 N.W.2d at 304; *see also Peterson*, 490 N.W.2d at 419 ("[W]e have examined applications for relief [in election challenges] ... from the perspective of whether the applicant acted promptly in initiating proceedings.").

Petitioners assert that they moved expeditiously and that any delay in seeking relief was reasonable under the circumstances. They contend that at most less than one week elapsed between the date on which Gauthier submitted his affidavit of withdrawal (September 6) and the date on which petitioners sought relief in this court (September 10). On this point, petitioners are correct. Between September 6 and September 10, a matter of 4 days, Gauthier attempted to file an Affidavit of Withdrawal, and notwithstanding the County Auditor's refusal to accept that filing, the DFL party proceeded with a nominating convention, nominated a candidate, and attempted to file an Affidavit of Candidacy. When that filing was also rejected, Martin and Simonson filed their petition with our court the same day. But, according to the County Auditor and Secretary Ritchie, by the time the petition was filed, only 4 days remained before the general election ballots were to be printed, and only 11 days remained until those ballots were to be made available to the voting public.

Laches is measured based on "an unreasonable delay in asserting a known right." *Fetsch*, 236 Minn. at 163, 52 N.W.2d at 115. We therefore must consider when petitioners were aware that a vacancy in nomination existed that would allow for a candidate substitution.

The County Auditor and candidate Silvers contend that petitioners' delay should be measured from July 2012, when the incident involving Gauthier occurred; or, by mid-August 2012, when the July incident was first made public and pressure began to build for Gauthier to withdraw.[2] But this line is drawn too early. Neither the incident (July 22), nor the media disclosure of that incident (August 16) provided petitioners with a "known right" to assert. *See Fetsch*, 236 Minn. at 163, 52 N.W.2d at 115. Gauthier remained the DFL nominee between July 22 and August 16 by virtue of his status as the only person who filed to run in District 7B as a DFL candidate. There was neither a withdrawal nor a vacancy during the weeks between July 22 and August 16 that would have implicated the procedures under sections 204B.12 or 204B.13. No delay, therefore, can be attributed to petitioners based on that timeframe,

By August 22, however, Gauthier had announced his intent to withdraw from the election, thus disavowing his status as the DFL nominee. While he had not yet attempted to file an Affidavit of Withdrawal, the DFL party certainly knew at that point that a vacancy would soon exist that would require a substitute nominee. Yet, in the intervening 2 weeks very little activity occurred. The DFL party waited 2 days, provided the 10 days' notice required by its rules for a nominating convention, and then waited until the next available Saturday (September 8) to hold the convention. In addition, for reasons not ex-

---

2. Respondent Ritchie did not take a position on laches.

plained in the record, Gauthier did not attempt to file his Affidavit of Withdrawal until September 6, 2012. We recognize that unrelated intervening events—Labor Day and the national political party conventions—may have made September 8 a convenient date for an unanticipated nominating convention to be scheduled. But the orderly administration of elections—particularly when it comes to ballot preparation—and voters' interest in knowing the names of candidates who will be on the ballot cannot wait for convenience. Had the DFL party issued its nominating convention notice as soon as Gauthier's announcement was made (August 22), the convention could have been held earlier. In light of the ballot preparation and availability deadlines, the expense associated with ballot preparation and election administration, and the need for voter certainty, petitioners must judge carefully whether they can afford to wait even a few days before acting upon a known right.

Nevertheless, while we are concerned about the time that elapsed before the petition filing on September 10, as well as the relatively short period of time between the filing of the petition and the deadline for when ballots had to be printed and available to voters, we do not believe it would be inequitable to grant relief here. We recognize that respondents face some prejudice due to the expense incurred in reprinting ballots. Minnesota law provides, however, for alternate ballot forms, Minn.Stat. §§ 203B.06, subd. 3a, 204B.30 (2010), and elections have been conducted in Minnesota in the past notwithstanding last minute vacancies and substitutions. And the petitioners are not entirely responsible for the time that passed between Gauthier's announced plan to withdraw and his actual attempt to file an affidavit of withdrawal. Given the paramount interests of voters, who are entitled to a ballot

that accurately identifies the candidates actually running for office, we proceed to address the merits of the petition.

### III.

■ Turning to the merits, we are called to decide whether Minn.Stat. §§ 204B.12 and 204B.13, subds. 1 and 2 (2010 and Supp.2011) require Gauthier's name to be removed as the DFL Party candidate for state representative for District 7B on the 2012 general election ballot, and require Simonson's name to be placed on that ballot instead.

■ When interpreting statutes, "[t]he object ... is to ascertain and effectuate the intent of the legislature." *State v. Gaiovnik*, 794 N.W.2d 643, 647 (Minn. 2011). We must first examine "whether the statute is ambiguous." *In re the Fin. Responsibility for the Out–of–Home Placement Costs for S.M.*, 812 N.W.2d 826, 829 (Minn.2012). In determining whether a statute is ambiguous, "we construe the statute's words and phrases according to their plain and ordinary meaning." *Id.* A statute is ambiguous if its language "is subject to more than one reasonable interpretation." *Id.* (citation omitted) (internal quotation marks omitted). If a statute is not ambiguous, we apply its plain meaning. *Id.*

Before discussing the two specific statutes at issue, a brief discussion of Minnesota election law is necessary to put these statutes in the proper context. *See Johnson v. Paynesville Farmers Union Coop. Oil Co.*, 817 N.W.2d 693, 708 (Minn.2012) (noting that in the statutory construction process, the statute is interpreted in context). Minnesota law provides that "[c]andidates of a major political party for any partisan office except presidential elector

... shall be nominated by primary." [3] Minn.Stat. § 204B.03 (2010). The primary election results determine a major political party's nominee, *see* Minn. Stat § 204D.10, subd. 1 (2010) ("The candidate for nomination of a major political party for a partisan office on the state partisan primary ballot who receives the highest number of votes shall be the nominee of that political party for that office."), unless only "one candidate files for nomination by a major political party for a partisan office," in which case that candidate is "declared the nominee upon the close of filing." Minn. Stat. § 204D.03, subd. 3. After the primary, the county canvassing board meets and canvasses the election results and reports the results to the county auditor, who sends the report to the Secretary of State. Minn.Stat. § 204C.32, subd. 1 (Supp.2011). The State Canvassing Board then meets to canvass the county canvassing board reports. Minn.Stat. § 204C.32, subd. 2 (2010). The Secretary of State, "[i]mmediately after the canvassing board declares the results," certifies "the names of the nominees to the county auditors." *Id.*

Gauthier was the only person who filed to run in the DFL primary. He therefore became the nominee of a major political party and his name was to be placed on the general election ballot for a partisan office. *See* Minn.Stat. § 204D.12 (2010) (stating that "the county auditor shall place on the appropriate state general election ballot the name of every candidate ... whose nomination at the state primary has been certified by the appropriate canvassing board").

With this background in mind, we turn to the specific statutes at issue in the petition—sections 204B.12 and 204B.13. Section 204B.12 addresses candidate withdrawals from an election, either before or after a primary. Subdivision 2a specifically provides that "[a] candidate for a constitutional office may withdraw from the general election ballot by filing an affidavit of withdrawal with the same official who received the affidavit of candidacy." Minn. Stat. § 204B.12, subd. 2a(a) (2010). Such an affidavit "must be filed no later than 16 days before the general election," unless the candidate withdraws because of major illness. *Id.*, subd. 2a(a)-(b).

Minn.Stat. § 204B.13, in turn, provides a process for filling a vacancy in the nomination of a candidate for an election. Under that statute, "[a] major political party has the authority to fill a vacancy in nomination of that party's candidate" for a partisan office "by filing a nomination certificate with the same official who received the affidavits of candidacy for that office." Minn.Stat. § 204B.13, subd. 2(a) (2010). "A vacancy in nomination exists," in part, when "a major political party candidate or nonpartisan candidate who was nominated at a primary dies or files an affidavit of withdrawal as provided in section 204B.12, subdivision 2a." Minn.Stat. § 204B.13, subd. 1 (Supp.2011). The nomination certificate must be "filed within seven days after the vacancy in nomination occurs or before the 14th day before the general election, whichever is sooner." *Id.*, subd. 2(b) (2010).

Petitioners argue that Minn.Stat. § 204B.13 gives the DFL Party the right to fill the vacancy in nomination created by

---

**3.** A state representative is a partisan office. *See* Minn.Stat. § 204D.11, subd. 1 (stating that the names for partisan offices voted on in the general election appear on the white ballot); Minn.Stat. § 204D.13, subd. 1 (2010) (listing the candidates for partisan office that appear on the white ballot to include state representatives). In addition, the DFL is a major political party. *See* Minn.Stat. § 200.02, subd. 7 (2010) (defining major political party).

the withdrawal of Gauthier from the District 7B race. They argue that pursuant to Minn.Stat. § 204B.13, subd. 2, a major political party has the right to fill a vacancy in nomination for any partisan office once the originally nominated candidate has withdrawn, as long as the originally nominated candidate files an affidavit of withdrawal in accordance with the procedures outlined in Minn.Stat. § 204B.12, subd. 2a. The affidavit of withdrawal that Gauthier attempted to file complied with the procedures outlined in section 204B.12, subdivision 2a. Gauthier filed his affidavit more than 16 days before the general election, and he filed it with the County Auditor. The DFL then attempted to file a certificate of nomination naming Simonson as the party's newly nominated candidate for District 7B. Therefore, petitioners conclude, Simonson's name must be put on the general election ballot in place of Gauthier's.

Respondents, on the other hand, argue that a major political party's right to fill a vacancy in nomination for a partisan office is narrow, and limited to the occasion when a candidate for a constitutional office withdraws from the general election ballot. They note that Minn.Stat. § 204B.13, subd. 1, defines the existence of a vacancy in nomination by reference to Minn.Stat. § 204B.12, subd. 2a, which in turn is limited to candidates for constitutional offices withdrawing from the general election bal-

lot. Because a state representative is not a constitutional office,[4] respondents argue that a major political party can fill a vacancy in nomination after the primary only when the vacancy is caused by the death of the party's nominated candidate for a state house seat.

When read together, we conclude that sections 204B.12 and 204B.13 are subject to more than one reasonable interpretation and therefore are ambiguous. One reasonable interpretation is that urged by respondents: the reference to section 204B.12, subdivision 2a, in the definition of a "vacancy in nomination" in Minn.Stat. § 204B.13, subd. 1, is substantive and limiting. Thus, a major political party can fill a vacancy in nomination caused by a withdrawal after the primary only when an affidavit of withdrawal is filed by *the type* of candidate authorized to do so pursuant to section 204B.12, subdivision 2a, i.e., a candidate for constitutional office. Another reasonable interpretation is that urged by petitioners: the reference to section 204B.12, subdivision 2a, in the definition of a "vacancy in nomination" in Minn.Stat. § 204B.13, subd. 1, is procedural. It simply provides the process that the originally nominated, partisan office candidate must follow to withdraw and trigger a vacancy in nomination that the party can fill.

Looking at the language of these statutes as a whole, we believe that petitioners' proposed construction is the more rea-

---

4. Petitioners agree that the term "constitutional office," as used in section 204B.12, subdivision 2a, does not include members of the Minnesota House of Representatives and instead is limited to those Executive Branch offices listed in Article V of the Minnesota Constitution. Neither chapter 204B nor the election laws in general define "constitutional office." Other statutes, however, use the term "constitutional office" to refer to the constitutional offices of the Executive Branch. *See* Minn.Stat. § 204C.35, subds. 1–2 (2010) (explaining recount procedures by separately referring to "state constitutional office" and "state legislative office"); Minn.Stat. § 206.90, subd. 6 (2010) (providing order in which offices will appear on optically scanned ballots as "state legislative offices; constitutional offices"); Minn.Stat. § 211A.14 (2010) (prohibiting a "legislator or state constitutional officer" from soliciting or accepting contributions during the regular session). For purposes of this opinion, we will assume that the term "constitutional office" does not include members of the Minnesota House.

sonable construction. *See Gaiovnik,* 794 N.W.2d at 647 (stating that in interpreting statutes, the court does "not examine different provisions in isolation. Instead, [it] construe[s] a statute 'as a whole,' and 'words and sentences are understood . . . in the light of their context.'" (quoting *Christensen v. Hennepin Transp. Co., Inc.,* 215 Minn. 394, 409, 10 N.W.2d 406, 415 (1943) (omission in original))). We conclude that Minn.Stat. § 204B.13, subds. 1, 2, gives a major political party the authority to fill a vacancy in nomination for any partisan office occurring after the primary if the originally nominated candidate has withdrawn by filing an affidavit of withdrawal in accordance with the procedures outlined in Minn.Stat. § 204B.12, subd. 2a. We reach this conclusion for several reasons.

First, the construction we adopt gives meaning to all of the language in section 204B.13. *See Am. Family Ins. Grp. v. Schroedl,* 616 N.W.2d 273, 277 (Minn.2000) ("A statute should be interpreted, whenever possible, to give effect to all of its provisions; no word, phrase, or sentence should be deemed superfluous, void, or insignificant." (citation omitted) (internal quotation marks omitted)). The relevant definition of "vacancy in nomination" in section 204B.13 includes both partisan and nonpartisan candidates. Minn.Stat. § 204B.13, subd. 1(1). A vacancy in nomination occurs when "a major political party candidate or nonpartisan candidate who was nominated at a primary dies or files an affidavit of withdrawal as provided in section 204B.12, subdivision 2a." [5] Minn. Stat. § 204B.13, subd. 1(1). Based on its wording and grammatical structure, this provision indicates that both partisan and nonpartisan candidates can create a vacan-

cy in nomination in two ways—by dying or by filing an affidavit of withdrawal. *See* Minn.Stat. § 645.08(1) (2010) (stating that in interpreting statutes, "words and phrases are construed according to rules of grammar").

But, if respondents are correct that a vacancy in nomination occurs only when a candidate for constitutional office files an affidavit of withdrawal after the primary, then the ability of nonpartisan candidates to withdraw would be limited to the occurrence of their death. This is so because there are no nonpartisan constitutional offices. *Compare* Minn.Stat. § 204D.13, subd. 1 (2010) (listing partisan offices on the general election ballot), *with* Minn. Const. art. V, § 1 (listing constitutional offices). Because there are no nonpartisan constitutional offices, respondents' interpretation would require that, subdivision 1(1) of section 204B.13 be re-worded, by adding the underlined language, so that a vacancy in nomination occurs when "a major political party candidate or nonpartisan candidate who was nominated at a primary dies or *a major political party candidate for a constitutional office* files an affidavit of withdrawal as provided in section 204B.12, subdivision 2a." This revision is not, however, a permissive construction. *See Genin v. 1996 Mercury Marquis,* 622 N.W.2d 114, 117 (Minn.2001) ("The rules of construction forbid adding words or meaning to a statute that were intentionally or inadvertently left out.").

Second, subdivision 6 of section 204B.13 refers broadly to *any* candidate withdrawing before the general election. *See* Act of Apr. 18, 2012, ch. 187, art. 1, § 31, 2012 Minn. Laws 188, 202–03 (to be codified at Minn.Stat. § 204B.13, subd. 6 (2012)) ("If *a candidate* withdraws after the 16th day

---

**5.** Judges are an example of nonpartisan races where candidates can be nominated in a pri-

mary.

before the general election but before four days before the general election . . . ." (emphasis added)). It then provides a process for striking the withdrawn candidate's name from the ballot, even though no other candidate's name will be substituted. *Id.* If only candidates for constitutional office can withdraw after the primary, the Legislature would have referred specifically to "the candidate for constitutional office" and not "a candidate." The Legislature's broad reference in subdivision 6 to any candidate withdrawing shortly before the general election indicates that even those candidates not expressly referenced in Minn.Stat. § 204B.12, subd. 2a, can withdraw from a general election.

Finally, respondents' proposed interpretation has the potential to lead to an absurd result. *See* Minn.Stat. § 645.17(1) (2010) (stating that in determining the intention of the legislature, "courts may be guided by the . . . presumption[ ] [that] the legislature does not intend a result that is absurd"); *Emerson v. Sch. Bd. of Indep. Sch. Dist. 199,* 809 N.W.2d 679, 686 (Minn. 2012) (refusing to adopt a party's proposed interpretation of an ambiguous statute, in part, because it would lead to absurd results). If respondents are correct, candidates' names in many races, other than those for the Executive Branch constitutional offices, must remain on the general election ballot, even though a candidate might withdraw from the race. There are many reasons why a candidate might withdraw from an election, other than death. To limit the ability of candidates for nonconstitutional offices to withdraw from the general election ballot due only to death leads to the possibility of multiple elections for one seat. For example, if the withdrawn nominee wins the election, a special election immediately becomes necessary to allow voters to once again choose their elected representative. Because petitioners' proposed construction eliminates this potentially absurd possibility, it is the more reasonable construction. *See In re Withdrawal of Candidacy of Stauffer,* 1 Pa.Cmwlth. 1, 1970 WL 11165, at *5 (Oct. 23, 1970) (noting the court is not "powerless to forestall what could become a chaotic state of affairs," if a candidate who withdrew from one election to run in a second election would win both contests, thus preventing "the voters, [from] decid[ing] which seat he would fill" and possibly "set up the requirement that another election be held.").

For these reasons, we hold that Minn. Stat. § 204B.13 gives a major political party the authority to fill a vacancy in nomination for a partisan office that was caused by the withdrawal of its originally nominated candidate after the primary, as long as the originally nominated candidate complied with the procedures for filing an affidavit of withdrawal outlined in Minn. Stat. § 204B.12, subd. 2a. A major political party fills this vacancy in nomination by filing a nomination certificate in accordance with the requirements of Minn.Stat. § 204B.13, subd. 2. Because a major political party's nominee is identified by the name on the ballot, *see* Minn.Stat. § 204D.12, Minnesota law requires that the originally nominated candidate's name be stricken from the general election ballot and that it be replaced with the name of the candidate listed in the nomination certificate.

We further hold that the County Auditor erred when he rejected the affidavit of withdrawal that Gauthier attempted to file. It is undisputed that were it not for the County Auditor's rejection of the filing, Gauthier complied with the procedures, outlined in Minn.Stat. § 204B.12, subd. 2a, for filing an affidavit of withdrawal. The County Auditor also erred when he rejected the certificate of nomination listing Simonson as the DFL-nominated candidate

that the DFL attempted to file after Gauthier attempted to file his affidavit of withdrawal. As a result, Gauthier's name must be stricken from the 2012 general election ballot and Erik Simonson must be listed at the DFL-nominated candidate for District 7B on that ballot.

Petition granted.

STRAS, J., took no part in the consideration or decision of this case.

WRIGHT, J., not having been a member of the court at the time of submission, took no part in the consideration or decision of this case.